**HITCH, ADMR.,**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH.**

Court of Claims of Ohio.

No. 93–14368.

Decided Nov. 13, 1995.

16

*Paul Kaufman,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *Eric A. Walker,* Assistant Attorney General, for defendant.

---

J. WARREN BETTIS, Judge.

On July 11, 1995, this action came before the court for trial on the sole issue of liability. The trial on the issue of damages commenced on July 27, 1995. Plaintiff, Rosemarie Hitch ("Hitch"), Administrator of the Estate of Benedict ("Ben") Wolanski, Jr., filed this action alleging that defendant, Ohio Department of Mental Health ("ODMH"), negligently failed to provide Ben Wolanski with competent, safe and acceptable care and treatment, and that the lack of treatment resulted in Ben Wolanski's death. Defendant denies that it was negligent and asserts that it cannot be held liable for the negligent acts of Ben Wolanski, as such acts were the intervening, superseding, and active proximate causes of Ben Wolanski's death. Further, defendant asserts that Ben Wolanski was contributorily negligent.

The court, having considered the totality of evidence and testimony, renders the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Ben Wolanski was born on March 19, 1959, and died on December 8, 1992, at the age of thirty-three.

2. During Ben's lifetime, he was hospitalized on nineteen occasions for a psychiatric condition.

3. On August 26, 1988, Ben was detained at the Western Reserve Psychiatric Hospital pursuant to an order issued by the Cuyahoga County Probate Court. On November 29, 1988, Ben became a voluntary patient at Western Reserve and discharged himself from Western Reserve on June 28, 1991.

4. On June 28, 1991, Ben became a resident of the Miles Park Residential Facility ("Miles Park").

5. Miles Park is a residential care facility maintained by the Aftercare Residential Services ("ARS"). Miles Park receives funding from the state indirectly: ODMH provides funding to the Cuyahoga County Mental Health

Board which, in turn, provides financial support directly to Miles Park. Residents at Miles Park receive case management services from Northeast Ohio Health Services ("NEOHS"), a private organization. Residents at Miles Park also receive care and treatment, provided by defendant through State Operated Services ("SOS").

6. Throughout 1992, Linda Sosenko, R.N., was a state employee, employed by SOS.

7. On November 13, 1992, Ben Wolanski was seen by Dr. Daksha Trivedi, M.D., a psychiatrist employed under contract with NEOHS. Ben was accompanied by his sister, Rosemarie Hitch. Dr. Trivedi evaluated Ben and concluded that Ben suffered from an organic personality disorder. Dr. Trivedi also concluded that Ben functioned at a borderline IQ level.

8. During her examination, Dr. Trivedi designed a course of treatment for Ben that would include use of anti-neuroleptic medicine. Because Ben also suffered from a seizure disorder (epilepsy), Dr. Trivedi prescribed an anti-neuroleptic with "less chance of lowering [Ben's] seizure threshold."

9. Thus, Dr. Trivedi ordered Ben to decrease the dosage of Mellaril, an anti-neuroleptic he had been taking over a two-week period. Following this two-week period, which began on November 28, 1992, Ben was to begin taking a new drug, Navane. However, Dr. Trivedi advised Ben to continue taking Tegretol, an anti-seizure medication that had been prescribed by Dr. Tucker, Ben's neurologist.

10. Dr. Trivedi also advised Ben to see his treating neurologist, Dr. Tucker, regarding Ben's seizure disorder for a "follow-up." Dr. Trivedi further instructed Ben to continue his supportive counseling, provided by SOS.

11. Nurse Sosenko visited Miles Park on a weekly basis. During these visits, she would meet with Ben to educate him and to discuss his drug monitoring. Nurse Sosenko testified that the frequency of these visits was decreased to a biweekly schedule during the late summer of 1992. Nevertheless, Nurse Sosenko also conducted frequent "spot checks" on Ben, usually once per week. Thus, Nurse Sosenko monitored Ben at least once per week.

During Nurse Sosenko's spot checks, she would check Ben's medicine cassette to determine whether or not Ben was taking his medication. If Ben forgot to take his medicine, Nurse Sosenko would remind (or "prompt") him to take his medicine. She could not, however, force Ben to take his medicine.

12. On Nurse Sosenko's regularly scheduled visit on November 17, 1992, she learned from Ben that his medication had been changed. Following Nurse Sosenko's visit, Rosemarie Hitch called Nurse Sosenko and also conveyed the information about Ben's medication change. Nurse Sosenko then called Dr. Trivedi and confirmed Ben's medication change. Further, Dr. Trivedi relayed

precise orders to Nurse Sosenko that Ben was to take 4 mg. of Navane. Linda Sosenko's notes of November 18, 1992, indicate that Ben's "Mellaril [will be] decreased to 200 mgm [at] bedtime only for two weeks, then [Dr. Trivedi] was going to start him on Navane * * * [*sic*]." Thus, Nurse Sosenko knew that on November 28, 1992, Ben was to begin taking Navane.

13. To help monitor Ben's medication compliance, Nurse Sosenko designed a medication monitoring log for Ben. In the log, Ben would initial a box under the date and time after he took each of his pills. For example, in November 1992, Ben took 325 mg. of iron three times a day. Thus, Ben would initial his name in the log after he took his iron pill at 8:00 a.m., 12:00 p.m. and 8:00 p.m. each day in November.

14. On November 28, 1992, Ben was to begin taking Navane. Thus, Ben's logs should have been changed prior to November 28, 1992, to comport with his new medication, Navane. Nurse Sosenko did not change Ben's logs.

15. Instead, Nurse Sosenko decided that Ben would not begin taking his new medication until December 1, 1992, and by doing so, she did not have to change the log until she inserted new sheets for the month of December. Therefore, by waiting until December 1, 1992, to change Ben's medication, Nurse Sosenko violated Dr. Trivedi's order that Ben begin taking Navane on November 28, 1992.

16. On December 1, 1992, Ben, on Nurse Sosenko's instructions, was to begin taking Navane. However, Ben never took his Navane. Instead, his medication cassette box remained full.

17. On Tuesday, December 1, 1992, Nurse Sosenko made a regularly scheduled visit to Miles Park. She observed Ben properly filling his medication cassette with his new medication and noted that he was complying with her instructions and schedule to take his medication. She testified at trial that the next regularly scheduled visit would have occurred on December 15, 1992. However, in accordance with Ben's treatment plan, Nurse Sosenko was required to conduct visits on a weekly basis. Nevertheless, Nurse Sosenko indicated that she would be returning to visit Ben on December 8, 1992, for a spot check.

18. On Thursday, December 3, 1992, Ben did not take his evening dosage of Tegretol. On Friday, December 4, 1992, Ben did not take either his 4:00 p.m. or 8:00 p.m. doses of Tegretol. In fact, Ben did not take any medication from Saturday, December 5, 1992, through the morning of Tuesday, December 8, 1992, when he died.

19. Regardless of Nurse Sosenko's contention that she was to conduct biweekly visits, Nurse Sosenko testified that she did visit Ben once a week. Thus, Nurse Sosenko's next visit following the December 1, 1992 visit would have occurred on December 8, 1992.

20. ARS's logs on Friday, December 4, 1992, indicate that "Ben is not doing so well, please keep a close eye on Ben." At 4:00 p.m., an ARS staff member phoned Nurse Sosenko and told her that Ben was not feeling well. Specifically, "[Ben's] forehead was cold [and] clammy, [his] stomach [was] upset, [he was] not eating (no dinner, breakfast or lunch), [he was] lethargic, looks drained, and has had a medication change—is also saying his heart ached."

21. ARS's log on Saturday, December 5, 1992, indicates at 2:00 p.m., "Please monitor Ben the remainder of today and tomorrow * * *. Supposedly Ben is not feeling well and may need medical attention."

22. However, Linda Sosenko's notes indicate at the 12:00 p.m. entry on December 5, 1992:

"Ben was seen in the Community Room. He had a big welcome smile on his face and said he had eaten stuffed peppers for dinner the night before. He was asked if he had breakfast and he said no—that he had just gone out earlier and bought his two pops * * *. He appeared tired, said he hadn't been eating much for the last few days and said that right side of his chest was hurting. His R.N. [Linda Sosenko] asked him if he would like to see a Doctor and he adamantly said 'No.' His forehead was cool * * *."

Significantly, the bottom of the entry has the following line: "Ben had 3 petit mal seizures—2 successive—one, one hour later—each lasting 4 or 5 seconds."

23. Although Ben did suffer from petit mal seizures in the past, three petit mal seizures in a ninety-minute period was abnormal for Ben.

24. Nurse Sosenko first testified that three such seizures were not abnormal or cause for concern. Because she was not concerned, she claimed she had not asked Ben about his medicine or even checked Ben's medication cassette.

However, Nurse Sosenko later recanted her testimony, and, in fact, testified that she did ask Ben if he had been compliant with his medication schedule after he suffered from seizures twice in succession.

25. The court finds Linda Sosenko's testimony unconvincing in light of her previous insistence that Ben's seizure activity on December 5, 1992, was not cause for concern.

26. Nurse Sosenko's notes indicate that at 5:00 p.m. on December 5, 1992, she called Brian Dwyer, Ben's NEOHS case manager, to report Ben's condition. Brian Dwyer did not have a medical background, nor was he in a position to assess Ben's medical condition. On the other hand, Linda Sosenko was trained in medicine and trained specifically in the side effects of medication such as Ben's. Nevertheless, Nurse Sosenko's notes indicated that she asked if Dwyer "could * * * please see Ben first thing Monday [December 7, 1992] morning to assess."

27.  At 7:00 p.m. on December 5, 1992, the ARS log indicates that "Ben [was] in [the] office complaining of anxiety, talked awhile, he then left to [go to the common room], he seemed O.K."

28.  At 11:05 p.m. on December 5, 1992, an ARS staff member checked on Ben and noted that "Ben stated he was O.K."

29.  On Sunday, December 6, 1992, the ARS progress notes indicate that a staff member "spoke [with] Ben briefly today and he stated he felt much better today * * *."

30.  At around 5:00 p.m. on December 6, 1992, Nurse Sosenko called Miles Park and inquired about Ben's condition. The staff member at Miles Park indicated to Nurse Sosenko that Ben was feeling better.

31.  Due to a death in his family, Brian Dwyer had to take a personal leave of absence on Monday, December 7, 1992. At 10:00 a.m. on December 7, Nurse Sosenko left a message on Brian Dwyer's voice mail that asked Brian "to see Ben and assess for a possible [doctor's] appointment—possible flu and increase in petit mal seizures noted." Because Brian was out of the office, he did not get this message until Tuesday, December 8.

32.  After noon on December 7, 1992, Hitch visited Ben at Miles Park. She had not seen Ben since Thanksgiving. Upon her arrival, Hitch went up to Ben's apartment. Ben answered the door and appeared unshaven and unkempt—a dramatic change from his normal appearance. Ben's apartment also appeared to be in disorder. Additionally, Hitch noted that Ben appeared to be acting very strange.

33.  A series of phone conversations then ensued. Initially, Hitch called Frances Harris, Program Director of SOS. Hitch related to Frances Harris that Ben did not appear to be acting appropriately. Frances Harris advised Hitch that Ben merely had the flu. However, Frances Harris indicated that she would call Hitch back after she contacted Ben's case manager.

34.  Frances Harris phoned Brian Dwyer, but he was not available. Frances Harris then called her supervisor and asked if she could contact Brian Dwyer's supervisor. After receiving permission, Frances Harris phoned Deborah Barris, NEOHS case management supervisor.

35.  In the interim, Linda Sosenko talked with Hitch. Sosenko indicated that Ben should see Dr. Tucker. However, Hitch felt that Ben should be seen by Dr. Trivedi because she had changed Ben's medication.

36.  Hitch then phoned Deborah Barris and relayed her concerns to Barris. Specifically, Hitch was concerned that Ben could be suffering from the side

effects of his new medication. As a result, Hitch felt that Ben should see Dr. Trivedi. Hitch asked if Barris would set up a doctor's appointment for Ben.

37. Deborah Barris next phoned Dr. Trivedi and scheduled an appointment with Dr. Trivedi during the doctor's lunch hour the next day (at around noon), December 8, 1992.

38. Around the same time, Nurse Sosenko called Dr. Tucker's office and described Ben's symptoms to Dr. Tucker's nurse. As a result, Nurse Sosenko decided to set up an appointment for Ben at 12:30 p.m. on December 8, 1992.

39. Frances Harris followed up by phoning Hitch and telling her that she had scheduled an appointment for Ben to see Dr. Tucker. According to Nurse Sosenko's notes, Hitch then stated:

"Dr. Tucker was not the [doctor that] Ben should see; Dr. Tucker is just Ben's neurologist. Dr. Trivedi was the [doctor] who ordered the Navane, and that is who he should see, not Dr. Tucker. She then repeated this to [Linda Sosenko]. Phone call was handed back to [Frances Harris] who told [Rosemarie] that SOS would cancel the [appointment with] Dr. Tucker, if that's what she wanted. She said O.K., go ahead and cancel the appointment, and I [Rosemarie] feel like pulling his Navane, because I have his Mellaril at home. [Frances Harris] instructed her that this would be taking matters into her own hands. [Rosemarie] said she knew the [doctor] would have to give permission to do that."

40. Further, Nurse Sosenko "reiterated to [Rosemarie] that Ben's problems were medical and [I] felt that he should be seen by Dr. Tucker. Rosemarie again stated that Dr. Tucker was his neurologist and Dr. Trivedi was the [doctor] who ordered the Navane."

41. Following this conversation, Nurse Sosenko called Deborah Barris. Nurse Sosenko informed Barris of the situation and they both agreed that Ben should see Dr. Tucker, Ben's neurologist. Deborah Barris agreed to call Hitch back to inform her that Nurse Sosenko would take Ben to Dr. Tucker. Deborah Barris then indicated to Nurse Sosenko that "Dr. Trivedi was concerned that maybe it was the Tegretol [that was] making [Ben] not feel well, not the Navane." At no time did Nurse Sosenko inform anyone about Ben's petit mal seizures.

42. Deborah Barris then called Hitch and informed her that Ben would see Dr. Tucker.

43. At around 6:00 p.m., Hitch took Ben out to dinner at Wendy's. Hitch indicated that Ben did not have his normal appetite. Hitch then took Ben back to Miles Park and later helped him clean up his apartment.

44. Early in the morning on Tuesday, December 8, 1992, Hitch phoned Dr. Tucker and expressed her concerns. Dr. Tucker told Hitch to make sure that Ben did not take his 8:00 a.m. dose of his medicine.

45. Hitch called Ben's apartment, but received no answer. She then called the ARS office and told an employee that, pursuant to Dr. Tucker's instructions, Ben was not to take his morning medication.

46. ARS staff members then went to check on Ben at around 8:00 a.m. Ben was found unconscious. The E.M.S. was called while the ARS staff performed CPR on Ben. E.M.S. personnel transported Ben to St. Alexis Hospital. Ben was pronounced dead shortly after his arrival at St. Alexis at approximately 8:45 a.m., December 8, 1992.

47. On December 9, 1992, Deputy Coroner Heather Raaf, M.D., performed the autopsy of Ben Wolanski under the direction of Elizabeth Balraj, M.D., the Cuyahoga County Coroner. Dr. Raaf concluded that Ben had a rare microinfarct—a microscopic heart attack. Ben also had a slightly enlarged heart. Upon examination of Ben's toxicology laboratory report, Dr. Raaf noted that Ben did not have any trace of antiseizure medication in his blood.

48. Based upon her review of Ben's medical history, and her review of the toxicology report, Dr. Raaf concluded that Ben died from a seizure disorder, etiology undetermined. In other words, Ben died from a seizure which was caused by his seizure disorder.

49. Therefore, the court finds that Ben Wolanski died from a seizure caused by his seizure disorder. Furthermore, the fatal seizure was caused by the failure to take Tegretol.

## CONCLUSIONS OF LAW

1. Under Ohio's wrongful death statute, R.C. 2125.01 *et seq.*, the administrator of the estate of Benedict Wolanski may bring suit for the benefit of Ben's beneficiaries against a party alleged to have caused Ben's death.

2. Plaintiff's claim is grounded in negligence. Thus, in order to prove her claim, plaintiff must show a standard of care, that defendant breached that standard of care, and that the breach was the proximate cause of plaintiff's injuries. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469–470.

3. First, plaintiff must establish that defendant owed a duty of care towards the decedent.

24

■ 4. Defendant, through SOS and Nurse Sosenko, had a duty of care towards Ben Wolanski. Defendant was responsible for the education and care of Ben Wolanski while Ben resided at Miles Park.

5. Further, Nurse Sosenko became responsible to monitor that Ben was taking his medication. Though she could not force Ben to take his medicine, Nurse Sosenko had the responsibility to check on Ben at least once a week. During these visits, Sosenko would inquire of Ben whether he was taking his medicines. Nurse Sosenko would also check Ben's medication logs to discover whether Ben was compliant with his medication schedule. Further, she designed Ben's log that listed his medication schedule. Additionally, Nurse Sosenko would check Ben's medication cassette to monitor whether Ben was taking his pills.

6. Through this pattern of behavior, Nurse Sosenko established a standard of care towards Ben Wolanski. Namely, at least once per week, she would monitor whether Ben Wolanski was compliant with his medication schedule.

7. Thus, plaintiff established that defendant had a reasonable duty of care to monitor Ben's medication.

8. Second, plaintiff must show a breach of that duty of care.

■ 9. Under the totality of the circumstances listed in paragraphs 10, 11, and 12, *infra*, defendant breached a duty of care towards Ben Wolanski.

10. Specifically, on November 28, 1992, Linda Sosenko had a duty to monitor whether Ben Wolanski switched his medication from Mellaril to Navane. However, Nurse Sosenko, in direct defiance of Dr. Trivedi's orders, did not switch Ben's medications until December 1, 1992. Moreover, she did not alter his medication logs, nor did she help Ben fill his medicine cassette with his new medication until December 1, 1992.

11. On December 5, 1992, Nurse Sosenko noted that Ben had three petit mal seizures within a ninety-minute period, but failed to question Ben about his medication. As noted above, three petit mal seizures in such a short period of time was highly unusual for Ben. Yet, not once during her visit with Ben on December 5, 1992, did Nurse Sosenko question him about his medication. In fact, she was aware that Ben was feeling ill; she checked his pulse and blood pressure, yet never bothered to ask him about his medication. She also did not check Ben's medicine cassette, nor did she check Ben's log.

12. Nurse Sosenko also had a long professional relationship with Ben. She knew him when he was a patient at Western Reserve, and knew that he had a history of noncompliance with his medication schedule, especially when he switched medicines. However, from December 1, through December 8, 1992, Nurse Sosenko never checked on Ben's medicines. Instead, she chose to rely on

Ben's short history of compliance with his medication schedule from approximately June 1992 through November 1992.

13. Therefore, on December 5, 1992, by not even once asking Ben if he took his medication, by not checking his log or even his medication cassette and knowing Ben's history of noncompliance with his medication schedule, especially when he began a different treatment, Linda Sosenko breached a duty of care toward Ben Wolanski.

14. Thus, defendant breached a duty of care toward Ben Wolanski in not monitoring whether Ben was compliant with his medication schedule.

15. Finally, plaintiff must prove that defendant's breach was the proximate cause of Ben Wolanski's death.

16. In *Clinger v. Duncan* (1957), 166 Ohio St. 216, 2 O.O.2d 31, 141 N.E.2d 156, 162, the Supreme Court of Ohio noted:

"The term 'proximate cause' is often difficult of exact definition as applied to the facts of a particular case. However, it is generally true that, where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender of liability."

17. Further, a reasonable foreseeability of injury is considered an element of proximate cause. See *Strother v. Hutchinson*, 67 Ohio St.2d at 287, 21 O.O.3d at 181, 423 N.E.2d at 471; *Ross v. Nutt* (1964), 177 Ohio St. 113, 114, 29 O.O.2d 313, 314, 203 N.E.2d 118, 120.

18. "It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in injury to someone." *Neff Lumber Co. v. First Natl. Bank* (1930), 122 Ohio St. 302, 309, 171 N.E. 327, 330, followed in *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 121, 90 N.E.2d 859, 863.

19. Thus, plaintiff must prove that defendant's actions were part of a natural and continuous sequence that caused Ben Wolanski's death which would not had occurred if defendant had acted.

20. Ben Wolanski's death was caused by a seizure which resulted from the lack of Tegretol in his body. Had Ben taken his Tegretol, he would not have had his fatal seizure.

21. Therefore, the court finds that the proximate cause of Ben's death was the failure to monitor Ben's level of Tegretol.

22. In its argument, defendant raised the issue of foreseeability. Defendant claimed that Ben's death was not a foreseeable result of Ben's not taking his medicine. Defendant misconstrues Ohio law. *Mudrich v. Std. Oil Co.*, 153 Ohio St. at 39, 41 O.O. at 121, 90 N.E.2d at 863, establishes that plaintiff does not have to show the particular injury (namely Ben's death), but must instead show that defendant's act was likely to result in an injury. *Id.*, 153 Ohio St. at 41, 41 O.O. at 122, 90 N.E.2d at 864 (Hart, J., dissenting). In other words, plaintiff must prove that the lack of Tegretol in Ben's system caused a seizure. Plaintiff does not have to prove that the lack of Tegretol caused Ben's death. Plaintiff has proven that the lack of Tegretol caused Ben to suffer from a seizure. Even defendant's expert, Dr. Robert Alcorn, M.D., conceded that if Ben did not take his Tegretol, he would suffer a seizure. Therefore, plaintiff has overcome defendant's foreseeability defense.

23. In its answer, defendant raises the issue of intervening and superseding causes. Specifically, defendant alleges that decedent's acts or omissions caused his death. The Supreme Court of Ohio has recognized that "[t]he determination of intervening causation 'involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of facts.' " *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 269, 617 N.E.2d 1068, 1071, quoting *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 160, 6 OBR 209, 214, 451 N.E.2d 815, 820.

24. Further, to determine whether the intervening act was foreseeable and therefore a consequence of the original negligent act, or whether the intervening act operates to absolve the original actor, the court must apply the *Cascone* test. *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d at 269, 617 N.E.2d at 1071. "The test * * * is whether the original and successive acts may be joined together as a whole, linking each of the actions as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor." *Cascone v. Herb Kay Co.*, 6 Ohio St.3d at 160, 6 OBR at 214, 451 N.E.2d at 819, citing *Mudrich v. Std. Oil Co.*, 153 Ohio St. at 39, 41 O.O. at 121, 90 N.E.2d at 863, and *Mouse v. Cent. Sav. & Trust Co.* (1929), 120 Ohio St. 599, 7 Ohio Law Abs. 334, 167 N.E. 868.

25. In *R.H. Macy & Co., Inc. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 111, 554 N.E.2d 1313, 1317, the Supreme Court of Ohio approved of a jury instruction that stated in part: "The causal connection of the first act of negligence is broken and superseded by the second, *only if the intervening negligent act is both new and independent * * *. The term 'new' means that the second act of negligence could not reasonably have been foreseen." (Emphasis added.) Thus, the key determination, " '[w]hether an intervening act breaks the

causal connection between negligence and injury, depends upon whether that intervening cause was reasonably foreseen by the one who was guilty of the negligence.'" (Emphasis deleted.) *Id.* at 110, 554 N.E.2d at 1316, quoting *Mudrich,* 153 Ohio St. at 39, 41 O.O. at 121, 90 N.E.2d at 863.

26. Thus, applying the *Cascone* test, and following *R.H. Macy,* the court finds that Ben Wolanski's acts or omissions may be linked with defendant's acts or omissions. In other words, defendant had a duty of reasonable care to monitor Ben's medication. By failing to do so, defendant's act must be inexplicably linked to Ben Wolanski's failure to take his Tegretol. Ben's noncompliance with his schedule of medicine was foreseeable; further, Ben's injury as a result of his noncompliance was also foreseeable.

27. Therefore, defendant's point is not well taken because the court finds that defendant's failure to monitor Ben's medication amounted to negligence which proximately caused Ben's death.

28. Next, defendant urges the court to follow a similar case in this court, *Sickles v. Cent. Ohio Psychiatric Hosp.* (July 23, 1993), Ct. of Cl. No. 91–08263, unreported. However, *Sickles* is distinguishable from the case at bar.

29. In *Sickles,* plaintiff's decedent (Holmes) suffered from several ailments and received medications for her condition. Holmes was found dead one morning in the Central Ohio Psychiatric Hospital. The coroner could not find any physical evidence as to her cause of death and concluded that she died from Sudden Unexpected Death Syndrome. Plaintiff sued defendant alleging that defendant was negligent in the care and treatment of Holmes. The court found that defendant was not liable because, "[w]hile defendant certainly was required to take reasonable precautions to [e]nsure that its mentally ill patients ingested the medication supplied to them, such requirement does not translate into a duty to *ensure* that all medication is taken." (Emphasis added.) *Id.* at 4.

30. However, *Sickles* is distinguishable for two reasons. First, the coroner could not establish a cause of death. In the case at bar, the coroner found that Ben Wolanski died from a seizure disorder. Second, the court never found that defendant breached a duty of reasonable care. In the case at bar, this court has found that defendant breached a duty of reasonable care. Although defendant is not under a duty to ensure that all medication is taken, defendant must exercise reasonable care towards plaintiff's decedent. Further, this court found that defendant's actions were a proximate cause of Ben Wolanski's death. Thus, this court need not follow the specific holding in *Sickles.*

31. Defendant, in its closing argument, also raised the issue of contributory negligence. However, the court previously addressed defendant's argument at trial. This court found that defendant had not proved contributory negligence.

This court also notes that the defense of contributory negligence is an affirmative defense pursuant to Civ.R. 8(C). In its answer, defendant did not plead the affirmative defense of contributory negligence. In fact, defendant did not raise this defense until its closing argument. Therefore, this court need not consider the issue of contributory negligence pursuant to Civ.R. 12(B). Assuming, *arguendo*, that defendant did cause the issue, this court stands by its original ruling on the record that the decedent, Ben Wolanski, was not contributorily negligent.

32. Therefore, the court finds in favor of plaintiff and against defendant on this cause of action for wrongful death.

33. Under Ohio's wrongful death statute, R.C. 2125.01 *et seq.*, plaintiff is entitled to recovery. R.C. 2125.02(B) allows that compensatory damages may be awarded in a wrongful death action. This court finds that plaintiff is entitled to compensatory damages in the amount of $78,712.33.

34. Further, the court may award damages under R.C. 2125.02(A)(2) for reasonable funeral and burial expenses. Plaintiff submitted proof of burial expenses totalling $5,251.98.

35. However, under R.C. 2743.02(D), recoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award or other collateral recovery received by the claimant.

36. The court finds that plaintiff recovered benefits under three separate insurance policies for an amount totalling $8,964.35. Thus, any recovery that plaintiff receives must be reduced by $8,964.35.

37. Therefore, the court finds that plaintiff is entitled to damages in the amount of $78,712.33, plus funeral expenses of $5,251.98, less collateral sources totalling $8,964.35. Thus, this court awards $75,000 for the wrongful death of Ben Wolanski.

*Judgment for plaintiff.*