**HITCH, Admr., Appellant and Cross–Appellee,**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH, Appellee and Cross–Appellant.**

**HITCH, Admr., Appellee,**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH, Appellant.**

[Cite as *Hitch v. Ohio Dept. of Mental Health* (1996), 114 Ohio App.3d 229.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 96API01-92 and 96API01-93.

Decided Sept. 24, 1996.

230

234

*Paul M. Kaufman*, for appellant and cross-appellee.

*Betty D. Montgomery*, Attorney General, *Eric A. Walker* and *Catharine M. Cola*, Assistant Attorneys General, for appellee and cross-appellant.

PEGGY BRYANT, Judge.

Defendant-appellant, Ohio Department of Mental Health ("ODMH"), appeals from a judgment of the Ohio Court of Claims in favor of plaintiff-appellee, Rosemarie Hitch, Administrator of the estate of Ben Wolanski, Jr. Plaintiff cross-appeals from the trial court's damages award and its denial of prejudgment interest.

On December 8, 1992, Ben Wolanski died at the age of thirty-three. During his lifetime, he suffered from a seizure disorder, an organic personality disorder, and borderline intellectual functioning.

In June 1991, following several years of inpatient treatment at Western Reserve Psychiatric Hospital, Wolanski discharged himself to live at the Miles Park Residential Facility in Cuyahoga County ("Miles Park"). Miles Park is a residential care facility maintained and operated by Aftercare Residential Services ("ARS"). Miles Park residents receive case management services from Northeast Ohio Health Services ("NEOHS"), and care, treatment, and some nursing services from State Operated Services ("SOS"). During his residency at Miles Park, Wolanski received some nursing care from Linda Sosenko, R.N., an experienced psychiatric nurse and employee of SOS.

When Wolanski first moved to Miles Park, his case management plan called for Sosenko to visit him every Tuesday. Because Wolanski had a history of noncompliance with his medication regimen, particularly when he was in a nonstructured setting or when his regimen was undergoing some sort of change, Sosenko devoted a significant part of each of her visits with Wolanski to

counseling him about his medication regimen. To aid him in taking his medication, Wolanski used a divided medication box which contained all of his medication for the coming week. Wolanski also used a medication log which he initialed after taking each dose of medication. During her Tuesday visits, Sosenko would check Wolanski's medication box and log to determine whether he had taken his medication properly during the preceding week, and then help him fill the box with medication for the coming week. If she discovered he had forgotten to take his medication, she would remind him of the importance of doing so, but she could not force him to take any medication.

By late summer 1992, Wolanski had progressed in his ability to self-medicate. As a result, his case management plan was changed to call for bi-weekly rather than weekly visits by Sosenko. Despite the change in plan, the actual frequency of Sosenko's visits with Wolanski continued to be about once a week due to her habit of conducting unscheduled "spot check" visits.

On November 13, 1992, Wolanski saw NEOHS psychiatrist, Dr. Daksha Trivedi. At this visit, Dr. Trivedi changed Wolanski's medication regimen. Dr. Trivedi ordered Wolanski to decrease for a two-week period his dosage of the drug Mellaril, an antineuroleptic drug which he had been taking for many years. At the end of the two-week period, Wolanski was to cease taking Mellaril altogether, and begin taking a new drug, Navane. Throughout the medication changes, Wolanski was to continue taking Tegretol, an antiseizure medication, which his neurologist had prescribed to control seizures.

During her regularly scheduled Tuesday visit on December 1, 1992, Sosenko changed Wolanski's medication log to reflect the change Dr. Trivedi had ordered, and she observed Wolanski properly fill his medication boxes with Tegretol and his new medication, Navane. Wolanski, however, never took any Navane. By the night of December 3, 1992, he had also failed to take his Tegretol. On December 4, he missed two more Tegretol doses, and after December 5, he ceased taking all medication.

On December 4, 1992, at 4:00 p.m., an ARS staff member called Sosenko and informed her that Wolanski was complaining of an upset stomach, muscle aches, and a headache. The staff member also reported that Wolanski's forehead was cold and clammy, he was lethargic, and he looked drained.

On December 5, 1992, Sosenko again visited Wolanski. When he saw her he smiled, although he appeared tired. He indicated that while he had eaten the night before, he had not been eating much. He had a cool forehead, and complained that the right side of his chest hurt. When Sosenko inquired whether he would like to visit the doctor, he adamantly refused. During the ninety minutes she was with Wolanski, Sosenko observed him suffer three petit-mal seizures, each lasting four to five seconds. Although Wolanski had previously

suffered such seizures, Sosenko's notes from the visit indicate Wolanski could have been experiencing an increase in petit-mal seizures. Nonetheless, Sosenko neither asked Wolanski about his medication nor checked his medication boxes or medication log. After her visit, she left two messages for Wolanski's case manager, Brian Dwyer, reporting Wolanski's condition and asking Dwyer to assess him on Monday morning December 7, 1992.

That night, Wolanski came to the ARS office complaining of anxiety. The ARS log indicates he talked for awhile, then he left to go to the common room and "seemed o.k." At 11:00 p.m. that night, an ARS staff member checked on Wolanski in his apartment, and he indicated he was "o.k." The next day, December 6, 1992, Wolanski told another ARS staff member he "felt much better"; when Sosenko called the ARS office that evening, a staff member told her Wolanski was feeling better.

When plaintiff visited Wolanski on Monday, December 7, 1992, Wolanski appeared atypically unshaven and unkept, and his apartment was in disarray. Plaintiff first called SOS program director, Frances Harris, to report that Wolanski did not appear to be acting appropriately. She then called Deborah Barris, an NEOHS case management supervisor and Dwyer's supervisor, to express her concern that Wolanski might be suffering side effects from his new medication; she asked Barris to set an appointment with Wolanski's psychiatrist.

Barris called Dr. Trivedi and reported plaintiff's concern. Dr. Trivedi indicated that he did not believe Wolanski was suffering side effects from his new medication, but suggested his symptoms could be seizure–related and he should see his neurologist to have his blood/Tegretol level checked. Barris then telephoned Sosenko and related Dr. Trivedi's opinion to her. Sosenko responded that she had scheduled an appointment for Wolanski to see his neurologist the next day, December 8, 1992. Sosenko did not attempt to contact Wolanski to inquire whether he had been taking his medication, nor did she request that someone else make such an inquiry or check his medication boxes or medication log.

Early on the morning of December 8, 1992, Wolanski was found unconscious in his apartment. Shortly after being transported to St. Alexis Hospital, he was pronounced dead. Dr. Heather Raaf of the Cuyahoga County Coroner's Office performed an autopsy on Wolanski and concluded that Wolanski's cause of death was "seizure disorder, etiology undetermined."

On October 27, 1993, plaintiff filed a complaint in the Court of Claims alleging both survivorship and wrongful death claims against ODMH. Plaintiff also filed complaints against NEOHS, ARS, and Dr. Trivedi in the Cuyahoga County Court of Common Pleas. In response, NEOHS, ARS, and Dr. Trivedi filed third-party

complaints against ODMH, which subsequently were removed to the Court of Claims and consolidated with plaintiff's action against ODMH.

The trial court bifurcated the case as to liability and damages. Plaintiff, NEOHS, ARS, and Dr. Trivedi first tried their claims against ODMH. The trial court found ODMH was liable for Wolanski's death, prompting ODMH to file a motion for reconsideration. The trial of plaintiff's claims against NEOHS, ARS, and Dr. Trivedi resulted in directed verdicts for NEOHS and ARS; a jury found Dr. Trivedi was not negligent.

Following a damages trial against the remaining defendant, ODMH, the trial court rendered its findings of fact and conclusions of law, denied defendant's motion for reconsideration, and awarded plaintiff $75,000 on her wrongful death claim. *Hitch v. Ohio Dept. of Mental Health* (1995), 75 Ohio Misc.2d 15, 662 N.E.2d 106. Plaintiff filed a motion for prejudgment interest, as well as a motion for a new trial on damages and/or reconsideration of damages and/or additur. On December 20, 1995, the trial court denied all of plaintiff's motions.

Plaintiff timely appealed to this court, assigning the following errors:

"I. The trial court erred in refusing to award prejudgment interest to the plaintiff.

"II. The trial court erred in refusing to grant a new hearing on damages or, in the alternative, to grant additur."

On January 28, 1996, ODMH cross-appealed, and assigned the following errors:

"I. The trial court erred as a matter of law by holding that ODMH owed Wolanski a duty of care and breached that duty of care since it was not likely, foreseeable or probable he would die of a seizure if he did not take Tegretol.

"II. The trial court erred as a matter of law by holding that Nurse Sosenko's actions proximately caused Wolanski's death.

"A. Appellee failed to prove by a reasonable degree of medical probability that Wolanski died of a seizure because he did not take Tegretol.

"B. Appellee failed to prove by a reasonable degree of medical probability that Wolanski would have survived if Nurse Sosenko asked him if he was taking Tegretol when she saw him on December 5.

"III. Dr. Trivedi's decision not to provide Wolanski with medical care after December 5 and Wolanski's decision not to take his medications were intervening and superseding acts that relieved ODMH of liability.

"IV. The trial court erred as a matter of law by allowing Dr. Trivedi to participate at trial as a third-party plaintiff since Dr. Trivedi did not file a

petition for removal in the Court of Claims as mandated by R.C. 2743.03(E) and Court of Claims Local Rule 4."

We begin with ODMH's assignments of error, as our resolution of the issues raised will determine the relevance of plaintiff's assignments of error.

■ To maintain a wrongful death action on a negligence theory, a plaintiff must show (1) the existence of a duty owed to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach and the decedent's death. *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 848, 631 N.E.2d 642, 646–647. Within that framework, ODMH's first assignment of error asserts the evidence does not support the trial court's finding not only that Sosenko owed Wolanski a duty to inquire whether he was taking his Tegretol when she visited him on December 5, 1992, but that she breached that duty.

■ Nurses are and have been since 1915 subject to licensure by the state. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 579, 613 N.E.2d 1014, 1020–1021. They must employ that degree of care and skill a registered nurse of ordinary care, skill, and diligence would employ in like circumstances. *Id.* at paragraph three of the syllabus. A registered nurse possessing specialized skill or training is held to the standard of care of an ordinary registered nurse possessing like specialization. See *Sabol v. Richmond Hts. Gen. Hosp.* (May 30, 1996), Cuyahoga App. No. 69507, unreported, 1996 WL 284883. A registered nurse breaches a duty of care owed to a patient if the nurse fails to comply with the applicable standard of conduct or care, which must be proved by expert testimony. *Berdyck, supra,* at paragraph three of the syllabus.

■ As to duty, ODMH argues that Sosenko did not owe a duty to check to see whether Wolanski was taking his medication because death was not a foreseeable result of Wolanski's failing to take his Tegretol. ODMH's argument confuses foreseeability as it relates to causation with the foreseeability necessary to establish duty. *Di Gildo v. Caponi* (1969), 18 Ohio St.2d 125, 130, 47 O.O.2d 282, 285, 247 N.E.2d 732, 735–736. In order to establish a duty, the particular harm which occurred need not have been foreseeable. *Id.* A duty arises if some harm or injury was a foreseeable consequence of the act or omission at issue. *Id.* As ODMH points out, the medical experts in the instant case all testified that death was not a likely consequence of Wolanski's failing to take his Tegretol. However, Stanley R. Platman, M.D., a board–certified psychiatrist and plaintiff's expert witness, and Robert W. Alcorn, M.D., a board–certified psychiatrist and an expert witness for ODMH, testified that an increase in both petit-mal, and the more serious grand-mal seizures, would be expected if Wolanski failed to take his Tegretol. Their testimony is sufficient to establish the foreseeability of some

harm necessary to support Sosenko's duty to ascertain whether Wolanski was taking his Tegretol.

As to a breach of that duty, Dr. Platman testified that given Sosenko's knowledge of the recent change in Wolanski's medication regimen, his history of noncompliance with his medication regimen particularly following a change in that regimen, his flu-like symptoms, and the three petit-mal seizures he experienced on December 5, 1992, her failure to inquire whether he was taking his medication, or to check his medication boxes or medication log to determine whether he had been taking his medication, was below the standard of care which would be expected of an experienced psychiatric nurse. His testimony provides sufficient evidence to support the trial court's finding that Sosenko breached a duty to check to see whether Wolanski was taking his medication.

ODMH's first assignment of error is overruled.

In its second assignment of error, ODMH asserts plaintiff failed to present evidence sufficient to prove that Sosenko's failure to ask Wolanski whether he was taking his medication or to check his medication boxes or log proximately caused Wolanski's death.

Proximate cause is "a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred." *Randall v. Mihm* (1992), 84 Ohio App.3d 402, 406, 616 N.E.2d 1171, 1174. In order to establish proximate cause, plaintiff had to present some competent, credible evidence that Sosenko's failure to ask Wolanski whether he was taking his medication or to check his medication boxes or log *probably* caused his death. See *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 485, 668 N.E.2d 480, 482; *Temple v. Voiers* (Dec. 20, 1995), Scioto App. No. 95CA2329, unreported, 1995 WL 762926. "Probably" is defined as "more likely than not" or a greater than fifty-percent chance. *Miller v. Paulson* (1994), 97 Ohio App.3d 217, 222, 646 N.E.2d 521, 524.

On direct examination Dr. Platman testified:

"Q. Dr. Platman, I want you to assume that the coroner's testimony in this case, to a reasonable degree of medical probability, is that Ben Wolanski died on December 8th, 1992, as a result of having suffered a major seizure, and that I've also already asked you to assume that as part of the toxicology studies that did screen for Tegretol, that there was no Tegretol in Ben's system at the time of his death.

"Do you have an opinion, Doctor, to a reasonable degree of probability, as to whether or not there was a direct and proximate causal connection between the

failures that you have described by Nurse Sosenko in failing to check Ben's medication on December the 5th, 1992, and again on December the 7th, 1992?

"Do you have an opinion to a reasonable degree of medical probability as to whether or not there is a direct and proximate causal connection between those failures and Ben Wolanski's death?

"Firstly, do you have an opinion?

"A. Yes.

"Q. What is your opinion?

" * * *

"A. I believe there was a proximal relationship between her failure to check on whether he was taking his medication and his death from seizure on the 8th."

Dr. Platman further testified:

"Q. Okay. And if Ben had not—excuse me, if Ben had seen a doctor on December 5th, is it your opinion that he would have not likely have [sic] died as a result of going to the doctor?

"A. I think if they found no Tegretol in his system and placed him back on Tegretol, he would not have died."

On cross-examination, Dr. Platman further testified:

"Q. And isn't it true that it was Ben's decision not to take his medication starting on December 1st with the Navane, for instance, and the Tegretol on December 14th, that was the proximate cause of Ben's death, true?

"A. It was the proximate cause, yes."

Recognizing the import of the question, the trial court remarked to counsel for ODMH:

"THE COURT: So you just asked a critical question in my view, when you asked the doctor if the proximate cause of Ben's death was the fact that he quit taking medicine. You asked the question.

" * * *

"THE COURT: And the doctor answered yes."

Dr. Platman later testified the "most proximate cause" of Wolanski's death was the failure to take his medication. While Dr. Platman's testimony could have been stronger, taken as a whole his testimony provides the proximate and causal link between Sosenko's breach of duty and Wolanski's death. As a result, it is sufficient to allow the court to find Wolanski's death was "probably" caused by Sosenko's failure to ask him whether he was taking his medication or to check his medication boxes or log.

ODMH argues, however, that plaintiff failed to present any evidence that Wolanski died of a seizure; thus, it argues, Dr. Platman's testimony, which rests on that assumption, does not prove Sosenko's failure to ascertain whether Wolanski was taking his antiseizure medication caused his death. In support, ODMH points to Dr. Raaf's autopsy report, which lists Wolanski's cause of death as "seizure disorder, etiology undetermined," arguing her testimony fails to establish Wolanski died of a seizure.

In her deposition, Dr. Raaf elaborated on her autopsy report as follows:

"A. Well, there's, you have what is called a cause of death and mechanism of death. Now, I am going to separate those for you, because what we have to write down is cause of death.

"The cause of death is the underlying disorder or injury, or whatever, that sets in motion all the other things that happen that lead to the death itself occurring.

"In this case, the underlying disease was his seizure disorder. The mechanism, which is the process by which the underlying disease manifests itself, would be seizure.

"So the cause of death in this case, as I said, just to repeat, is the seizure disorder. The mechanism would be a seizure. But those are two different things and you generally will not say seizure. You don't use a mechanism as your cause of death officially."

The mandate of medical autopsy protocol that the official cause of Wolanski's death be listed as "seizure disorder" is not controlling. Dr. Raaf testified that the "mechanism" which brought about Wolanski's death was a seizure, and her testimony is sufficient to support a finding that the legal cause of Wolanski's death was a seizure. Thus, Dr. Raaf's and Dr. Platman's testimony taken together support the trial court's finding that Sosenko's failure to ascertain whether Wolanski was taking his medication was the proximate cause of his death.

ODMH's second assignment of error is overruled.

In its third assignment of error, ODMH asserts that the chain of causation between Sosenko's negligence and Wolanski's death from a seizure was broken by the intervening acts of Wolanski's failure to take his medication and Dr. Trivedi's failure to order a blood test to determine Wolanski's blood/Tegretol level on December 7, 1992.

In *Berdyck*, the Ohio Supreme Court set forth the law on intervening acts:

"The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior

negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. 'Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.' " *Id.*, 66 Ohio St.3d at 584, 613 N.E.2d at 1024.

 "An important factor that must be considered in determining whether an intervening cause breaks the causal chain is that of the foreseeability by the original tortfeasor of the intervening cause or causes * * *." *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 159, 6 OBR 209, 213, 451 N.E.2d 815, 819.

As to Wolanski's failure to take his Tegretol, the evidence indicated that Wolanski functioned at an intellectual level only slightly above the legal definition of mental retardation and suffered from motivational problems. Based on that evidence, reasonable minds arguably could conclude that Wolanski was not a "responsible human agency" regarding the need to take his medication. See *Guhn v. Clyde–Green Springs School Dist. Bd. of Edn.* (June 30, 1989), Sandusky App. No. S–88–16, unreported, 1989 WL 72245. More important, the foregoing coupled with Wolanski's history of noncompliance with his medication regimen and the recent change in that regimen allows reasonable minds to conclude that Wolanski's failure to take his Tegretol was foreseeable.

Nonetheless, ODMH argues that because Sosenko could not force Wolanski to take his Tegretol, her discovery of the problem with his medication could not assure that he would have resumed taking the appropriate dosages. ODMH thus asserts that the chain of causation between her negligence and his death is broken.

Sosenko testified that Wolanski trusted her, had come to understand the need to take his medication, and was one hundred percent compliant in taking his medication between July 21, 1992 and December 1, 1992. Her testimony strongly suggests that had Sosenko discovered Wolanski was not taking his Tegretol, she would have been able to persuade him to resume taking the medication. Plaintiff need not prove that Wolanski definitely would have resumed his medication, but only that it was more likely than not. *Temple, supra.* Sosenko's testimony supports such a finding.

 ODMH's claim that Dr. Trivedi's failure to order a blood test on December 7, 1992, intervened to relieve it of liability for Sosenko's negligence also fails. In their statement of the facts, ODMH concedes that judicial proceedings determined that Dr. Trivedi's actions on December 7, 1992 were not

negligent. Thus, those actions could not be the negligent intervening cause described in *Berdyck.* See *Miller Chevrolet, Inc. v. Hewitt* (Oct. 2, 1975), Cuyahoga App. No. 33923, unreported. Further, even if Dr. Trivedi had been found to be negligent, that negligence would have been a concurring, rather than independent, cause of Wolanski's death, and would not have broken the chain of causation. *Berdyck, supra.*

ODMH's third assignment of error is overruled.

 In its fourth assignment of error ODMH challenges the trial court's decision to try Dr. Trivedi's third-party complaint against ODMH along with plaintiff's claims against ODMH; ODMH argues that Dr. Trivedi's third-party complaint against ODMH should not have been tried because a petition to remove the complaint to the Court of Claims was never filed, as required by R.C. 2743.03(E)(1)[1] and C.C.R. 4(A).[2]

The transcript reveals that, for whatever reason, Dr. Trivedi's third-party complaint was transferred to and stamped in the Court of Claims. Aware of the transfer, ODMH did not at that time challenge the procedural propriety of the transfer. Moreover, ODMH does not assert that Dr. Trivedi's alleged failure to file a petition for removal deprived it of an opportunity to prepare a defense. Given those circumstances, we cannot find reversible error on this record, especially when the transfer mandated under R.C. 2743.03(E)(1) and C.C.R. 4(A) was accomplished.

ODMH's fourth assignment of error is overruled.

In her first assignment of error, plaintiff asserts that the Court of Claims erred in denying her motion for prejudgment interest. Plaintiff contends that R.C. 2743.18(A) and 1343.03(C), read together, entitle her to prejudgment interest on her $75,000 judgment against ODMH.

R.C. 1343.03 provides as follows:

"(D) *Divisions (B) and (C) of this section [awarding prejudgment interest in civil actions based on tortious conduct] do not apply to a judgment, decree, or order rendered in a civil action based on tortious conduct* if a different period for computing interest on it is specified by law, or if it is *rendered in an action*

---

1. R.C. 2743.03(E)(1) provides in relevant part as follows:
 "A party who files a counterclaim against the state or makes the state a third-party defendant in an action commenced in any court, other than the court of claims, *shall file a petition for removal in the court of claims.*" (Emphasis added.)

2. Similarly, C.C.R. 4(A) provides in relevant part as follows: "Petition for removal. A party who serves a counterclaim against the state or makes the state a third-party defendant in an action commenced in a court other than the court of claims *shall file a petition for removal in the court of claims.*" (Emphasis added.)

*against the state in the court of claims,* or in an action under Chapter 4123. of the Revised Code." (Emphasis added.)

■ Absent a common-law exception, R.C. 1343.03(D) prohibits the Court of Claims from awarding prejudgment interest in tort actions. *Moore v. Univ. of Cincinnati Hosp.* (1990), 67 Ohio App.3d 152, 586 N.E.2d 213 Because no common-law exception exists in the present case, plaintiff is not entitled to prejudgment interest under R.C. 1343.03(D).

■ Plaintiff, however, further contends that the denial of prejudgment interest to tort claimants in the Court of Claims violates the Equal Protection Clauses of the United States and Ohio Constitutions.[3] *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 491, 21 O.O.3d 302, 307, 424 N.E.2d 586, 591–592. She asserts that by prohibiting tort claimants in the Court of Claims from recovering prejudgment interest, R.C. 1343.03 unconstitutionally discriminates between such claimants and claimants who may recover prejudgment interest, such as contract claimants in the Court of Claims and tort claimants in all courts other than the Court of Claims.

■ Legislative enactments enjoy a presumption of constitutionality. *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus; *Doyle v. Ohio Bur. of Motor Vehicles* (1990), 51 Ohio St.3d 46, 554 N.E.2d 97. Moreover, a statute which discriminates is not necessarily unconstitutional. *Roseman v. Firemen & Policemen's Death Benefit Fund* (1993), 66 Ohio St.3d 443, 446–447, 613 N.E.2d 574, 576–577. By the very nature of its work, the legislature frequently discriminates between groups or classes of individuals in granting benefits or imposing burdens. *State ex rel. Doersam v. Indus. Comm.* (1989), 45 Ohio St.3d 115, 119, 543 N.E.2d 1169, 1173.

■ In determining whether a statute violates equal protection, we must first examine the classification drawn by the statute to determine whether a suspect class or fundamental right is involved. *Roseman,* 66 Ohio St.3d at 447, 613 N.E.2d at 577. Plaintiff concedes that the classifications created by R.C. 1343.03 involve neither a suspect class nor a fundamental right. Thus, the classifications are subject to a "rational basis" level of scrutiny. *Id.* Under a rational basis analysis, a statute will be declared invalid on equal protection grounds only if it bears no rational relation to a legitimate state interest, and no

---

3. The Equal Protection Clauses are found at Section 1, Fourteenth Amendment, United States Constitution, and Section 2, Article I, Ohio Constitution, respectively. The protection afforded by those provisions is essentially identical.

grounds can be conceived to justify it. *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181, 182–183.

The preservation of fiscal integrity is a legitimate state interest. *Shapiro v. Thompson* (1969), 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600, 614; *Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St.3d 351, 353, 639 N.E.2d 31, 33–34. The legislature's prohibiting tort claimants from recovering prejudgment interest in the Court of Claims is rationally related to the preservation of the state's fiscal integrity, as it preserves state money and eliminates an unquantifiable liability.

While singling out tort claimants for such treatment may seem unfair, tort claimants sue the state only to the extent the state has consented to be sued. "When the state consents to be sued, it may qualify and draw perimeters around that granted right without violating * * * equal protection. When a state has the power to give, it may give only part and limit that which is granted." *Grange Mut. Cas. Co. v. Columbus* (1989), 49 Ohio App.3d 50, 52, 550 N.E.2d 524, 527; see, also, R.C. Chapter 2743. Because a tort claimant's restricted right to recovery of prejudgment interest in the Court of Claims is rationally related to a legitimate state interest and a valid limitation on the state's consent to be sued, R.C. 1343.03 does not violate the equal protection guarantees of the United States or Ohio Constitutions.

Plaintiff's first assignment of error is overruled.

In her second assignment of error, plaintiff asserts that the trial court's damage award of $75,000 is "grossly inadequate." A damage award which is supported by competent, credible evidence may not be reversed on appeal. *O'Neil v. State* (1984), 13 Ohio App.3d 320, 321, 13 OBR 398, 398–400, 469 N.E.2d 1010, 1012–1013. However, if a damage award is against the manifest weight of the evidence and so grossly inadequate as to "shock the conscience," a reviewing court cannot allow the award to remain undisturbed. *Id.*

In support, plaintiff stresses that the trial court devoted less than half a page in a twelve-page opinion to the issue of damages, failing to indicate how its compensatory damage award was determined. While the trial court could have devoted more attention to the issue of damages, its failure to do so standing alone is insufficient to warrant reversal. Plaintiff must also demonstrate by reference to the record how the trial court's damage award fails to adequately compensate her for legally compensable damages. See *id.*

R.C. 2125.02(B) lists the damages which are compensable in a wrongful death action as follows:

"Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:

"(1) Loss of support from the reasonably expected earning capacity of the decedent;

"(2) Loss of services of the decedent;

"(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, minor children, parents, or next of kin;

"(4) Loss of prospective inheritance to the decedent's heirs at law at the time of his death;

"(5) The mental anguish incurred by the surviving spouse, minor children, parents, or next of kin."

Plaintiff does not point to any specific element of damages contained in R.C. 2125.02(B) as having been overlooked or undercompensated by the trial court. Nor does plaintiff point to any evidence in the record which would suggest that the trial court's damage award is against the manifest weight of the evidence.

██ The record of the damages trial reveals that, besides funeral expenses, which were properly awarded by the trial court pursuant to R.C. 2125.02(A)(2), plaintiff's compensable damages were limited to loss of society under R.C. 2125.02(B)(3), and mental anguish under R.C. 2125.02(B)(5). While plaintiff's loss of her brother's society and her mental suffering are significant damages, such noneconomic damages are not subject to straightforward mathematical calculation. See *Carter v. Simpson* (1984), 16 Ohio App.3d 420, 423, 16 OBR 490, 493–494, 476 N.E.2d 705, 708–709; *McCarty v. Hall* (Apr. 7, 1987), Greene App. No. 86–CA–44, unreported, 1987 WL 10144. Consequently, unless an award "shocks the conscience," reviewing courts generally defer to the trier of fact's determination with respect to noneconomic damages. See *Fantozzi v. Sandusky Cement Prod. Co.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474. Although the damages award here may be low, plaintiff has failed to demonstrate that the trial court's damage award is so inadequate as to "shock the conscience."

Plaintiff's second assignment of error is overruled.

Having overruled plaintiff's two assignments of error and ODMH's four assignments of error, the judgment of the Ohio Court of Claims is affirmed.

*Judgment affirmed.*

PETREE, P.J., and LAZARUS, J., concur.