## STATE, Use of SHOCKEY, Etc. v. WASHINGTON SANITARIUM AND HOSPITAL

[No. 74, September Term, 1960.]

*Decided December 8, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*June L. Green* for the appellant.

*J. Roy Thompson, Jr.,* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment in favor of the defendant for costs after the trial court directed a verdict in favor of the defendant at the close of the defendant's case. The action was brought against the defendant, Washington Sanitarium and Hospital, upon the theory that it was guilty of negligence in failing to prevent the suicide of a patient.

The decedent, a resident of Pennsylvania, had been admitted to the Sanitarium on May 8, 1957, as a private patient of Dr. Andren, a psychiatrist consulted by the decedent and his wife. Mr. Shockey had bcome severely depressed. In a letter from the physician who had treated him in Pennsylvania, there was a reference to the patient having taken an overdose of a drug some time before. Dr. Andren diagnosed his condition as "manic-depressive reaction—hypomanic state". It appeared that he had been diagnosed as manic-depressive by Dr. Kress in 1921, when he was nineteen years of age, but had recovered. There was testimony that the hypomanic phase is not as intense as the acute manic phase, and "borders on nearly normal behavior".

Mr. Shockey was admitted to Oaklea Hall, which is set aside for patients who need special observation or treatment, but on the following day, at the direction of Dr. Andren, was transferred to Lisner Hall, a fully open unit for milder nervous cases, where patients may move about freely. Dr. Andren testified the patient was encouraged to visit the lawn and recreation rooms and to associate with other patients. This was a part of the treatment. A relaxing medication, sparine, was prescribed. Mr. Shockey remained in Lisner Hall, except for intervals when he was allowed to go home, until May 26, 1957, when he was discharged as markedly improved and returned to work.

On August 25, 1957, Mr. and Mrs. Shockey again came to the Sanitarium. Dr. Andren was undergoing surgery, and they were referred to his associate, Dr. Philpott, an independent psychiatrist who was then practicing with Dr. Andren. Dr. Philpott examined the patient, his history, and prior treatment and had him admitted to Lisner Hall without any special nursing or custodial care. Dr. Philpott discussed with the patient the alleged incident concerning an overdose of a drug. The patient denied having any suicidal tendencies. Dr. Philpott ordered essentially the same routine to which Mr. Shockey had previously responded. He testified the patient was anxious and tense but not suicidal. If he had thought he was suicidal, he would not have admitted him to the Sanitarium.

On August 26, 1957, after a quiet night, Mr. Shockey had a light breakfast and went to the hydrotherapy department for a bath and massage. The attendant testified he was in good spirits. He returned to his room until lunch, after which he received the prescribed medication, sparine. He was scheduled for another hydrotherapy at 4:00 P. M., but the supervising nurse, Mrs. Tobias, found he was not in his room. When a messenger did not locate him on the lawn, Mrs. Tobias learned he was playing checkers with other patients in the recreation room of the occupational therapy department. In the meantime, the hydrotherapy department had taken another patient; so Mrs. Tobias let the matter rest. Mrs. Green, another hospital employee, testified that Mr. Shockey came into the recreation room, and she invited him to join the game she was playing with two female patients. He did so. At a little after 4:00 P. M. she left to get her supper. Mr. Shockey had just started another game with the two other patients. He took part in the conversation and seemed in good spirits.

At about 4:30 P. M. a nurse, looking out of a window on the fourth floor, saw Mr. Shockey climbing over the parapet, about three feet high, surrounding the roof of the main building, hanging by his hands, and then dropping. He was killed in the fall and his death was recorded as suicide. The recreation room is on the sixth floor of the building. It was not shown how Mr. Shockey gained access to the roof, but presumably it was through a door into several sun rooms, open at the top with glass walls about five feet in height. The door into these rooms was customarily kept locked when they were not in use. Whether it was locked or open after the incident was not shown.

The appellee concedes that there is a duty upon a sanitarium or hospital to exercise such care in looking out for and protecting a patient as the circumstances, including known mental and physical conditions, may reasonably require. Failure to do so may be negligence, and if suicide is a proximate result of the negligence, recovery may be had under the wrongful death statute, at least where immunity is not pleaded. But what are reasonable precautions must depend upon the cir-

cumstances of the particular case. See *Mesedahl v. St. Luke's Hospital Ass'n of Duluth*, 259 N. W. 819 (Minn.), *Stallman v. Robinson*, 260 S. W. 2d 743 (Mo.), and cases collected in Note 11 A.L.R. 2d 751, 775 et seq.

The appellant argues that negligence can be predicated upon the failure of the supervising nurse to insist that Mr. Shockey receive the hydrotherapy treatment at 4:00 P. M. as scheduled. We think not. The testimony was clear that under the orders of his attending physician the patient was not to be placed under restraint and that no special attendant was thought necessary or desirable. When Mrs. Tobias found he had missed his appointment but was playing checkers in the recreation room, there was no cause for alarm. We find nothing in the record to put the hospital authorities on notice that he was contemplating suicide. The attending private physician, with full knowledge of the history and medical background of the patient, did not anticipate suicide or feel that it was likely to happen.

There is a presumption that a doctor has properly performed his medical duties with requisite care and skill. Cf. *Lane v. Calvert*, 215 Md. 457, 462, and *Bettigole v. Diener*, 210 Md. 537, 541. See also *State v. Baltimore Eye, Ear, etc., Hospital*, 177 Md. 517, 527. It is conceded that the attending physician in the instant case was not the agent or servant of the Sanitarium. It was not incumbent upon the nurses and attendants to apply restraints or supervision which the attending physician did not desire, at least in the absence of anything to indicate a change in the patient's condition. The attending physician is not a party to this action, nor is it contended that he was negligent in prescribing the course of treatment he did or in failing to order restraints upon the patient's movements. Dr. Philpott testified he "did not consider this man seriously depressed. * * * I did not consider him to be in any danger for himself or anyone else. And Lisner was a proper place, in my judgment, for him and I ordered medicine for him accordingly."

Nor do we find any evidence of negligence in leaving the patient in the recreation room with other patients or in leaving the door into the sun rooms unlocked, if it was unlocked.

In the absence of anything in the record to put the nurses and attendants on notice that the patient was likely to climb over the glass walls of the sun room and the parapet of the roof, they could hardly be expected to anticipate and prevent it.

*Judgment affirmed, with costs.*