706 P.2d 1234

**Anna RUDY, individually and as surviving spouse of Frank Rudy, deceased, for and on behalf of their natural children, Ann Marie Rudy, Mark Rudy, Jennifer Rudy, and Frank Rudy, Jr., Plaintiff/Appellant,**

**v.**

**Edward MESHORER, Defendant/Appellee.**

**No. 2 CA–CIV 5278.**

Court of Appeals of Arizona, Division 2, Department A.

May 1, 1985.

Review Denied Sept. 24, 1985.

Haralson, Kinerk & Morey, P.C. by Carter Morey and Denneen L. Peterson, Tucson, for plaintiff/appellant.

Chandler, Tullar, Udall & Redhair by D.B. Udall, Tucson, for defendant/appellee.

## OPINION

FERNANDEZ, Judge.

This case presents the question of whether it is proper to grant summary judgment to a psychiatrist sued in a medical malpractice action because of the suicide of a hospitalized mental patient when no expert testimony has been presented that the psychiatrist's actions fell below the standard of care required. We hold that it is proper and affirm the lower court's ruling.

Appellant's decedent, Frank Rudy, was admitted to the voluntary psychiatric unit at St. Mary's Hospital in the early evening of November 6, 1980. On November 8 he left the hospital around 5:30 p.m. The next morning his body was found hanging from a bridge in Tucson. The cause of death was determined to be suicide.

Rudy, a resident of Benson, had been an alcoholic for three to four years prior to his death, particularly the last year of his life. Sometime in September he had stopped drinking and in October had become very depressed. He had been receiving therapy from a counselor once or twice a week since late September at Cochise Behavioral Health Services in Benson. On September 27 he had received some "brain" tests at Tucson Medical Center.

Shortly before he was taken to St. Mary's, he told his wife he had been looking at some knives, that he should have used one on himself but could not. He also told her he had sold his soul to the devil. His wife made an appointment for him to see the psychiatrist at Cochise Behavioral Health Services who recommended that he be hospitalized after his wife insisted he needed more help.

When he was admitted to St. Mary's he told the nurse he did not know why he was there. Her notes indicated that he had been neither eating nor sleeping and that he had become preoccupied with death. She also noted he heard voices that told him he was going to die. During the admission interview, Rudy attempted to burn his hand with a cigarette. He told the nurse it was to show he had no feelings and therefore must be dead. Rudy told her he did not want to come to the hospital, and his wife signed the admitting papers after he refused to sign them.

The appellee, Dr. Meshorer, a psychiatrist with staff privileges at St. Mary's, first saw Rudy on Friday morning, November 7. The admitting nurse had telephoned him on November 6 and conveyed information to him about Rudy; he had thus become the admitting physician. He stated in his deposition that nothing the nurse had told him that evening had indicated to him Rudy was suicidal.

After Dr. Meshorer examined Rudy on November 7, he wrote in his report that Rudy was not oriented as to place and only

partially as to time, although he was oriented to person. He also noted that Rudy would not volunteer information and mostly answered "yes", "no" or "I don't know" to questions. The "diagnostic impression" shown on the chart reads as follows: "1. Question of Organic brain syndrome. 2. Question of psychotic depression." The doctor then officially admitted Rudy to the ward and ordered a chest x-ray, electrocardiogram and a number of laboratory tests in order to rule out possible causes of his illness. He prescribed an antidepressant and ordered that the results of the brain scan at TMC be obtained. Not all the tests had been performed before Rudy eloped from the hospital. The doctor testified he did not believe Rudy to be a danger to himself or others at the time of his examination.

Dr. Meshorer saw Rudy again on the morning of November 8. At that time he ordered a few more tests and told the staff to watch out for Rudy's incessant smoking because the doctor was concerned he was a fire hazard. Dr. Meshorer did not see him again.

The nurses' progress notes during the time Rudy was a patient indicate he was non-communicative, that he chain-smoked, appeared to be hallucinating, was confused and uncomfortable at the unit. He told one nurse he was not supposed to be there, that something had scared him about his family and that is why he had said he was dead. He was seen mumbling to himself and frequently stood in one place for long periods of time. On November 7 there was an entry listing problems and treatment approaches. One of the problems shown was "harm to self," and the treatment approach indicated he was to be observed at all times when he was smoking. He was noted to be very disheveled. On November 8 he told a nurse he was ready to go home.

Mrs. Rudy had telephoned the hospital during the morning of November 8. When she spoke to Rudy he told her he had to get out of there, that he was all dressed and ready to go home. She had a friend call the hospital to tell the nurse what Rudy

had said. The information was noted in his file. Dr. Meshorer testified he was not told of the call. Rudy left the hospital that afternoon.

Dr. Meshorer testified that several options are available to the staff when it is determined by a doctor that a patient is suicidal. Those options include a one-to-one surveillance of the patient, the prescribing of medication or the seclusion of a patient in one of two seclusion rooms that were available. In addition the staff would take away all sharp objects and, if necessary, transfer him to a closed facility such as Kino Community Hospital.

Depositions were taken of most of the nurses who had dealt with Rudy during his stay. All indicated they did not believe he was suicidal, and one stated she did not think he had sufficient energy to commit suicide. Dr. Meshorer testified "there's no litmus test that shows suicide," that it is a subjective judgment whether or not someone might commit suicide.

After Rudy left the hospital, the doctor ordered him to be secluded when he returned. In the police report filled out when Rudy left the hospital was the notation "subject described as suicidal and depressed."

Appellants' only expert testimony in opposition to the summary judgment motion filed by appellee was the deposition of Patricia Anderson, a registered nurse who is the director of psychiatric services for the department of nursing at Kino Community Hospital. Anderson also has a master's degree in psychiatric nursing and is taking classes toward a doctorate. She testified that a review of Rudy's records from St. Mary's Hospital and the depositions of the doctor and five of the nurses who cared for Rudy indicated to her that he was suicidal during his stay at the hospital.

Appellants contend it was improper to grant summary judgment because they presented considerable expert testimony from appellee himself, from the nurses who cared for Rudy and from their psychiatric nurse from which a jury could conclude that appellee was negligent in failing to

recognize that Rudy was suicidal and in failing to order appropriate action to prevent Rudy from killing himself. We must view the evidence and resulting inferences in a light most favorable to appellants in reviewing the granting of summary judgment. *Boyle v. City of Phoenix*, 115 Ariz. 106, 563 P.2d 905 (1977); *Brown v. Sears, Roebuck & Co.*, 136 Ariz. 556, 667 P.2d 750 (App.1983).

The testimony of appellee and of the nurses who cared for Rudy was that he did not appear to be suicidal. Although they testified with regard to remarks made by Rudy as to his preoccupation with death, his hearing of voices saying he was going to die and his apparent discomfort at being in the hospital, not one said that he or she believed he would kill himself. Their evidence does not support appellant's contentions.

The only evidence that Rudy should have been diagnosed as suicidal came from appellant's expert, Anderson. The rules in this state with regard to medical malpractice have existed for a long time. In *Boyce v. Brown*, 51 Ariz. 416, 77 P.2d 455 (1938), the supreme court held that negligence by a doctor must always be affirmatively proved and that in order to show the existence of a jury question there must be evidence of the medical practice standard in the community. Finally, any negligence by a doctor must be established by expert medical testimony unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. Accord, *Pendleton v. Cilley*, 118 Ariz. 84, 574 P.2d 1303 (1978).

■ The testimony of a registered nurse cannot be used to establish the standard of care a doctor must meet. *Rodriguez v. Jackson*, 118 Ariz. 13, 574 P.2d 481 (App.1977). In that case this court held that a distinction can be made between testimony on causation and testimony on the standard of care required. Thus, we held that a pharmacologist could testify as to the effects of the drug administered because it related to causation, but neither she nor a physiologist nor a registered

nurse was qualified to testify on the doctor's standard of care. Appellant has cited the case of *Meier v. Ross General Hospital*, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968). The court there reversed a verdict for defendants for the suicide of a mental patient who had been placed in a second floor room with a window which could be opened fully. Although plaintiffs had not introduced expert testimony, the court held laymen could determine if the actions were negligence since the cause of death related to the window. The threshold question here, however, is whether the doctor was negligent in his determination that Rudy was not suicidal; hence, Anderson's testimony does not meet the requirements of the rule.

■ Alternatively, appellants contend that the negligence is so grossly apparent that a layman could easily recognize it; hence, there is no need for expert testimony on the issue. We disagree. This is not the type of case in which that exception has been applied. Those cases are ones such as *Tiller v. Von Pohle*, 72 Ariz. 11, 230 P.2d 213 (1951) in which a large cloth sack was left in a woman's abdomen after an operation and *Revels v. Pohle*, 101 Ariz. 208, 418 P.2d 364 (1966) in which pieces of steel sutures were left in a patient after an operation. Nor is this similar to the cases cited by appellant. In *Nixdorf v. Hicken*, 612 P.2d 348 (Utah 1980), the alleged negligence was the loss of a portion of a needle in the surgical site. In *Mellies v. National Heritage, Inc.*, 6 Kan.App.2d 910, 636 P.2d 215 (1981), it was improper nursing care that resulted in bedsores. Since nursing care was at issue, expert testimony from nurses was permitted.

We recognize that the diagnosis of suicide potential is a very difficult one to make. As Dr. Meshorer testified, it involves a subjective judgment. There is no clinical test for suicide. No jury could properly determine whether or not the facts available to Dr. Meshorer about Rudy justified his determination that he was not a suicidal risk without the assistance of expert testimony from a physician. Appel-

lants' cases are inapplicable. In *Meier v. Ross General Hospital*, supra, the patient had previously attempted suicide. That was also the case in *DeMontiney v. Desert Manor Convalescent Ctr.*, 144 Ariz. 6, 695 P.2d 255 (1985). In *Lucy Webb Hayes National Train. Sch. for D. & M. v. Perotti*, 419 F.2d 704 (D.C.Cir.1969), although there was no previous attempt, the patient had been diagnosed as suicidal.

The party opposing a summary judgment motion must show that he has evidence available to justify a trial. *Pendleton v. Cilley*, supra. Since appellants presented no expert testimony on the standard of care required of the doctor, the trial court properly granted summary judgment to appellee.

Affirmed.

BIRDSALL, P.J. and HOWARD, J., concur.