UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HILDEGARD M. TRAPNELL,
Individually and in her
Representative Capacity for Minor,
Audrey Trapnell; PHILLIP BRUCE
TRAPNELL, JR.,

No. 96-2012

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederick N. Smalkin, District Judge.
(CA-95-1471-S)

Argued: October 28, 1997

Decided: December 15, 1997

Before ERVIN, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Glenn Louis Klavans, MURPHY & KLAVANS, L.L.C.,
Severna Park, Maryland, for Appellants. Charles Joseph Peters, Sr.,
Assistant United States Attorney, Baltimore, Maryland, for Appellee.
**ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore,
Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants Hildegard M. Trapnell, Phillip Bruce Trapnell, Jr., and Audrey Catherine Trapnell, are -- respectively-- the wife and minor children of Phillip Bruce Trapnell, Sr. Mr. Trapnell, Sr., committed suicide on June 18, 1992. The appellants filed a wrongful death action against the United States under the Federal Tort Claims Act, alleging that physicians at the Veterans Administration Medical Center (VAMC) in Baltimore, Maryland, negligently failed to admit Mr. Trapnell and that that negligence was the proximate cause of Mr. Trapnell's suicide. The district court granted summary judgment for the United States. We affirm.

Under Maryland tort law, a person generally does not have a duty to prevent another's suicide, even when that suicide is foreseeable, unless the person has a special relationship with the potential victim. See, e.g., Eisel v. Board of Education of Montgomery County, 597 A.2d 447, 450 (Md. 1991). Thus, the VAMC doctor would have had a duty to take reasonable precautions to prevent Mr. Trapnell's sui-cide only if she (or her employer, VAMC) had a special relationship with Mr. Trapnell and her observations of Mr. Trapnell, together with the information conveyed to her by the Trapnells, made Mr. Trap-nell's suicide foreseeable.

The Maryland courts have not ruled directly on whether a doctor or hospital has a special relationship with a patient who is not in cus-todial care. However, even if Maryland were to recognize that a psy-chiatrist generally has a special relationship with patients who are not in her custody or that a special relationship existed on the facts of this case because Mr. Trapnell had only recently been released from VAMC's in-patient care and had a scheduled out-patient follow-up appointment, we believe that a Maryland court would not find a duty on the part of the VAMC doctor or her employer because, based on the information she had, Mr. Trapnell's suicide was not foreseeable.

2

On June 18, 1992, Mr. Trapnell went to VAMC requesting to see a psychiatrist because of "depression." He was interviewed by Dr. Gayle Jordan-Randolph, a psychiatrist in her first year of residency. J.A. at 95-98. Based on the information she gathered in that interview, Dr. Jordan-Randolph decided not to admit Mr. Trapnell. As appellants' counsel conceded at oral argument, nothing in that interview can reasonably be construed as giving Dr. Jordan-Randolph notice that Mr. Trapnell was suicidal. When asked, Mr. Trapnell specifically denied having any suicidal or homicidal intentions or ideations. J.A. at 100-02.

Appellants argue that Dr. Jordan-Randolph and VAMC"should be charged with the knowledge of Mr. Trapnell's mental condition, by virtue of his recent in-patient hospitalization there." Appellants' Brief at 11. Even if knowledge of Mr. Trapnell's full mental health history is imputed to Dr. Jordan-Randolph and VAMC, however, there is nothing in that history that made Mr. Trapnell's June 18 suicide foreseeable. Mr. Trapnell's recent in-patient treatment at VAMC was largely related to his alcohol abuse, and Mr. Trapnell did not express any suicidal or other harmful intentions at any time during his hospitalization. J.A. at 64, 72-75. In fact, he repeatedly confirmed that he was neither suicidal nor homicidal. J.A. at 59-60, 69-73. Indeed, although Mr. Trapnell had been receiving psychiatric care for over thirty years for bipolar disorder, J.A. at 43-54, Mr. Trapnell had never expressed suicidal or homicidal intentions either on or before June 18, 1992, with the possible exception of expressing some suicidal thoughts during a hospital admission in the late 1960s. Moreover, with the possible exception of a recent incident in which Mr. Trapnell had taken more sleeping pills than he was supposed to,[1] which Mrs. Trapnell believes was an attempt by Mr. Trapnell to harm himself, Mr. Trapnell had never attempted suicide prior to June 18, 1992. Mrs.

_____

[1] Mrs. Trapnell alleges that at some time on June 15, 16, or 17, Mr. Trapnell took "more sleeping pills than he was supposed to" and that, when she asked him why, he said "I wish I could just go to sleep." J.A. at 87-89. Mrs. Trapnell never asked her husband what he meant by that statement. Mrs. Trapnell claims that she told Mr. Trapnell's private physician, Dr. Smith, about this incident, but Dr. Smith does not recall being told and his notes about Mr. Trapnell from that week do not mention the incident.

Trapnell did not tell Dr. Jordan-Randolph or anyone else at VAMC about the sleeping pill incident. J.A. at 102.

That Mr. Trapnell's imminent suicide could not have been predicted by VAMC doctors is confirmed by the fact that neither Mr. Trapnell's medical history nor his behavior on June 18 alerted his wife or Dr. Smith, his private psychiatrist of 18 years, that Mr. Trapnell was suicidal. Mrs. Trapnell -- who had been married to Mr. Trapnell for almost twenty years -- testified that on the day Mr. Trapnell died, he gave no indication that he would harm himself, or she would not have left him alone with their minor children that evening. J.A. at 94. The fact that she did not try to have Mr. Trapnell admitted to another hospital on June 18 after VAMC did not admit him also confirms that she did not believe he was immediately at risk. J.A. at 82, 67-68. Similarly, Dr. Smith did not believe that Mr. Trapnell was suicidal when he saw Mr. Trapnell at his appointment on June 16, when he visited Mr. Trapnell during his in-patient care at VAMC through June 15, or when he spoke to Mr. Trapnell on the telephone on June 18 about going to the hospital. J.A. at 64.

Appellants argue nonetheless that even if Mr. Trapnell's suicide was not foreseeable from Dr. Jordan-Randolph's interview with Mr. Trapnell, Dr. Jordan-Randolph had a duty to do a more complete assessment of Mr. Trapnell and that, had a fuller evaluation been performed, Mr. Trapnell's suicide would have become foreseeable. See Appellant's Brief at 13. Even assuming that Dr. Jordan-Randolph had a duty under Maryland law to exercise reasonable care in her assessment of Mr. Trapnell and that her evaluation fell below the requisite standard of care, however, appellants have not presented sufficient evidence from which a jury could conclude that that negligence caused Mr. Trapnell's suicide.

As discussed above, even if Dr. Jordan-Randolph had spoken to Dr. Smith and reviewed the records from Mr. Trapnell's recent hospitalization,[2] nothing in Mr. Trapnell's history as detailed in those

_____

[2] Dr. Jordan-Randolph attempted to obtain the records from Mr. Trapnell's recent discharge but was unable to review those records because they were not available. Dr. Jordan-Randolph also paged Dr. Forester, who was one of the attending physicians during Mr. Trapnell's recent admission, but Dr. Forester was not available during the time when Dr. Jordan-Randolph was evaluating Mr. Trapnell. J.A. at 128-29.

4

records or known to Dr. Smith would lead a reasonable person to believe that Mr. Trapnell was at serious risk of attempting suicide that night if not hospitalized. Additionally, if Dr. Jordan-Randolph had asked Mrs. Trapnell more detailed questions about her husband's condition, Dr. Jordan-Randolph might have elicited a description of the sleeping pill incident. However, at that time, Mrs. Trapnell did not appear to view the incident as particularly serious or as indicative of suicidal tendencies: Mr. Trapnell's suicide that night was as much a shock to her as to anyone else. J.A. at 94. Mrs. Trapnell, understandably, appears to be attributing much more significance to this event in hindsight. Moreover, given that Mr. Trapnell was denying any intent to commit suicide on the night in question, it would have been reasonable for Dr. Jordan-Randolph to conclude that Mr. Trapnell was not at risk, even if she had known about the alleged sleeping pill overdose. Cf. State ex rel Shockey, 165 A.2d 764, 765-66 (Md. 1960) (holding that a hospital was not on notice and therefore not liable for the suicide death of an in-patient mental patient, even though the patient had allegedly "taken an overdose of a drug some time before," because the patient "denied having any suicidal tendencies" when questioned about the alleged overdose and his "private physician . . . did not anticipate suicide or feel that it was likely to happen"). Also, appellants' allegations that, if Dr. Jordan-Randolph had conducted a more comprehensive interview, she might have been able to elicit some statement from Mr. Trapnell that would have indicated that he was suicidal are purely speculative. Thus, a jury could not reasonably find that -- more likely than not -- a fuller interview would have made Mr. Trapnell's suicide foreseeable. Because appellants cannot establish that it is more probable than not that, absent negligence, Mr. Trapnell's suicide would have been foreseeable, that alleged negligence cannot be the proximate cause of Mr. Trapnell's suicide under Maryland law.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

5