D.P. and R.P., Appellants,

v.

WRANGELL GENERAL HOSPITAL
and Elsie Hansen, Appellees.

No. S–8024.

Supreme Court of Alaska.

May 19, 2000.

Rehearing Denied, Aug. 8, 2000.

James W. McGowan, Sitka, Gregory F. Cook, Douglas, for Appellants.

William T. Council, Juneau, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Chief Justice.

## I. INTRODUCTION

D.P. was diagnosed with schizophrenia and admitted to Wrangell General Hospital. The admitting orders stated that D.P. should remain in the building. Although D.P. remained under periodic observation, she walked out of the hospital. During her brief absence, she had sexual relations with a man whom she delusionally believed was either "Jesus" or "a prophet." D.P. sued the hospital and the duty nurse for negligence, and now appeals the superior court's grant of a directed verdict for both defendants. Because we hold that reasonable jurors could differ concerning whether the defendants breached their duty of care regarding D.P., we reverse the superior court's ruling and remand the case for trial.

## II. FACTS AND PROCEEDINGS

### A. Facts

D.P., 43, has a history of auditory hallucinations, delusions, and other schizophrenic symptoms. Medication has generally enabled D.P. to control her condition.

D.P. was treated by Dr. David McCandless, a Wrangell general practitioner, and Kathy Koch and Mark Walker, mental health professionals from Wrangell Mental Health Services. In April 1992 Dr. Ulrich Schoettle, a clinical psychiatrist from Seattle, also began seeing D.P. every other month.

In the spring of 1994, D.P.'s caregivers became concerned that she had stopped taking her medication. By May she was significantly more agitated and began to complain of physical distress from the medication. Despite Dr. Schoettle's recommendation of a

new antipsychotic drug, D.P. underwent further deterioration by July and began to experience religious delusions.

Early on July 19, Dr. McCandless admitted D.P. to the hospital, diagnosing her with "schizophrenia, psychotic decompensation." In his hospitalization order, Dr. McCandless wrote in part as follows:

Up as tolerated, should stay in building, under observation/suicide precautions.

. . . .

For Agitation/Hallucinations/Danger to self or Others

-Haldol 5–10 mg + Ativan 1–2 mg IM Q4° prn [1]     OR AS Needed

-Restraints prn only if danger to self or others.

When D.P. was admitted she was distraught and delusional. During the day D.P. was observed by four nurses, each on different duty shifts. The nurses' notes show that each nurse regularly checked on D.P. at intervals ranging from a few minutes to two hours. D.P. slept intermittently throughout the day, refusing food and medication. She continued to have delusions and was distraught and agitated. At 4:00 p.m. Nurse Elsie Hansen came on duty. During Hansen's shift, D.P. was noticeably more active and "cheerful," walking throughout the hallways and visiting another room. At 6:50 p.m. Hansen's notes indicate "[D.P. is] out in hallway—states she will walk to ER and then lay down in [her room]." At 6:55 p.m. Hansen went to check on D.P. but was unable to locate her. In the intervening five minutes, D.P. had walked out of the hospital.

Once outside the hospital, D.P. met a temporary forest service worker. In her delusional state, D.P. believed that he was either "Jesus" or "the prophet." D.P. and her new acquaintance spoke for several hours, after which they engaged in sexual relations in a local park. At approximately 10:10 p.m., police officers arrived and returned D.P. to the hospital. The next day, Dr. Schoettle had D.P. involuntarily committed to the Alaska Psychiatric Institute (API).

1. "Prn" is medical shorthand for "as needed."

## B. *Proceedings*

In June 1995 D.P. sued the hospital and Hansen (collectively defendants) for negligence in failing to provide "reasonable and attentive care, including, but not limited to, adherence to physician's orders, regular monitoring and accurate record-keeping." She sought compensatory damages against both defendants and punitive damages against Hansen individually.

The defendants answered, denying D.P.'s allegations of negligence. D.P. then submitted an interrogatory, requesting that the defendants explain their denial of D.P.'s charge that "[n]o effort had been made to restrain" D.P. from leaving the hospital. The defendants replied:

> The Hospital's employees understood that [D.P.] was not to be permitted to leave the Hospital facility. The nurse on duty checked on [D.P.] from time to time as the nurse felt it was necessary under the circumstances at any particular time. See the medical records, and in particular the progress notes, which document in part the contacts between Hospital employees and [D.P.]. Had any Hospital employee known that it was [D.P.]'s intention to leave the Hospital facility, she would not have been allowed to do so. Unfortunately, D.P. did leave the Hospital, but not as a consequence of any failure on the part of any Hospital employee to exercise reasonable care under the circumstances at that time.

D.P. interpreted this answer as an "iron-clad" admission of the existence of a duty of care, the standard of care, and the breach of a duty of care. Therefore, D.P. did not designate any expert witnesses, choosing instead to rely solely on the defendants' interrogatory answer.

At a pretrial hearing held January 24, 1997, the superior court ruled that expert testimony was required to establish the standard of care and the breach of a duty of care. At trial on January 27, the court approved D.P.'s request to call defendants' expert witness, Dr. Schoettle, to testify regarding these issues.

D.P. experienced difficulty eliciting information favorable to her case from Dr. Schoettle. She attempted to show that Hansen breached a duty of care by violating Dr. McCandless's "cut and dried" order to keep D.P. in the hospital. Dr. Schoettle testified that a physician's orders should be viewed holistically. He explained that, as a whole, the specific instructions that D.P. should remain in the building, under observation, and with suicide precautions reflected a directive to "be attentive" to the patient, requiring "general observation and supervision."

Dr. Schoettle further testified that hospitals should maintain an "open door policy" for voluntary psychiatric patients, attempting to normalize the patient's environment rather than imposing artificial controls and restraints. He testified that the "[n]ormative community standards in hospitals for observations of psychiatric patients are checking every 15[ ] minutes to a half hour." Dr. Schoettle later clarified that only acutely suicidal patents require observation every fifteen minutes.

After D.P.'s examination of Dr. Schoettle, the defendants moved for a directed verdict under Civil Rule 50, arguing that D.P. had failed to establish either the standard of care or a breach of duty. D.P. argued that Dr. Schoettle's testimony proved that, although some flexibility existed regarding the extent of supervision necessary, none existed regarding whether to permit her exit from the building.

Although the superior court concluded that Dr. Schoettle's testimony had not established a breach, it allowed D.P. to reopen her direct examination of Dr. Schoettle to make this inquiry. After further questioning, Dr. Schoettle testified that the nurses had executed Dr. McCandless's orders within the "norm of community standards." He stated:

> I don't see in—in my professional opinion that there was a miscommunication, a negligence, a nursing decision where somebody made it on their own and—and had some wild idea or—or did anything different than I would have expected any nurse to do. Sometimes patients walk out.

Dr. Schoettle also testified that the nurses had observed D.P. with adequate frequency.

But Dr. Schoettle acknowledged that the "fact that the patient went out implies [negligence]," although he did not believe that the nurses were negligent. Dr. Schoettle explained that an order to stay in the building is actually "an assumed" order for any patient, psychiatric or otherwise. He noted that even in psychiatric wards, doors are often left unlocked or open, and patients are allowed to commingle.

The court concluded that Dr. Schoettle's testimony had established the standard of care but failed to show a breach of duty by either the hospital or Hansen. It therefore directed a verdict for the defendants and dismissed D.P.'s claims.

## III. STANDARD OF REVIEW

■ In reviewing the superior court's decision to grant a directed verdict, we view the evidence in the light most favorable to the nonmoving party.[2] We will affirm a directed verdict only where reasonable jurors could not reach different conclusions.[3]

■ Whether expert testimony is required to show a breach of a duty of care represents a question of law to which we apply our independent judgment. We will adopt the rule of law most convincing in light of precedent, reason, and policy.[4]

2. See *Fairbanks N. Star Borough v. Lakeview Enters., Inc.*, 897 P.2d 47, 53 n. 5 (Alaska 1995).

3. See *id.*

4. See *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

5. *Kendall v. State, Div. of Corrections*, 692 P.2d 953, 955 (Alaska 1984) (quoting *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 200 (Alaska 1980)).

6. *Id.*

7. See, e.g., *Rudy v. Meshorer*, 146 Ariz. 467, 706 P.2d 1234, 1236–38 (App.1985) (requiring expert testimony to show that psychiatrist "was negligent in his determination that [decedent] was not suicidal"); *Dimitrijevic v. Chicago Wesley Mem'l Hosp.*, 92 Ill.App.2d 251, 236 N.E.2d 309, 313 (1968) (requiring expert testimony to determine "whether defendant doctors failed to exercise ordinary skill and care in not characterizing decedent as a suicidal risk"); *Kanter v. Metropoli-*

## IV. DISCUSSION

### A. It Was Error to Require D.P. to Present Expert Testimony as to the Breach of a Duty of Care.

■ The general rule in medical malpractice actions provides that "the jury ordinarily may find a breach of professional duty only on the basis of expert testimony."[5] "The primary limitation to this rule is that expert testimony is not needed in non-technical situations where negligence is evident to lay people."[6] D.P. relies on this exception.

■ The defendants rely primarily on cases discussing whether the health care provider failed to recognize the suicidal or elopement tendencies of the patient or failed to order appropriate precautions.[7] These cases, however, are distinguishable from the present situation because D.P. does not allege that defendants failed to appreciate her mental health status, to recognize a risk of harm to her, or to order reasonable precautions. She instead faults the defendants' failure to follow the ordered precautionary measures.

It remains far from clear that D.P.'s case should be viewed as a "medical malpractice" action. Most courts characterize cases in which the plaintiff alleges a failure to adequately supervise and safeguard the patient as involving "ordinary negligence" issues.[8]

*tan Med. Ctr.*, 384 N.W.2d 914, 916 (Minn.App. 1986) (recognizing that expert testimony would assist trier of fact in determining whether nurse should have recognized patients' "potential [suicidal] tendencies").

8. See, e.g., *Meier v. Ross Gen. Hosp.*, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519, 523, 529 (1968) (where decedent leapt from hospital window, alleged failure to supervise involved only "ordinary negligence" issues since it did not concern "the propriety of any controverted medical diagnosis or treatment"); *Paulen v. Shinnick*, 291 Mich. 288, 289 N.W. 162, 164 (1939) (where patient leapt from window, "whether [attendant] should have locked the screen ... or [ ] taken some other precaution to prevent plaintiff's escape, is not a question on which a jury requires the advice of trained psychiatrists"); *Stallman v. Robinson*, 364 Mo. 275, 260 S.W.2d 743, 745, 749 (1953) (where decedent hung herself with her nightgown, expert testimony not required to determine "whether the patient was reasonably safeguarded and protected, in the circumstances in view of her known condition" because case

Further, in Alaska, medical malpractice actions are governed entirely by statute.[9] Alaska Statute 09.55.536(a) sets forth specific procedural requirements for medical malpractice cases. Under this section, either the parties must submit a malpractice claim to arbitration or the court must appoint an expert advisory panel within twenty days of the answer to the complaint. Neither occurred here. Moreover, the superior court recognized that the parties had failed to treat the action as one for medical malpractice.[10]

In *Clary Insurance Agency v. Doyle*,[11] we distinguished between medical malpractice issues and those involving ordinary negligence:

> Not every act of a professional requires an instruction on the professional standard of care. *Meier v. Ross General Hospital*[12] illustrates the point. *Meier* involved a wrongful death action by the widow of a suicide victim who had jumped through an unbarred second story window of a hospital. The court concluded that the case supported instructions on both ordinary negligence and medical malpractice. Issues relating to improper medical diagnosis and chemotherapy treatment required an instruction on the professional standard of care. But the court concluded that an instruction on ordinary negligence was appropriate on the question of whether it was negligent to allow the decedent, who was

depressed and had previously slashed his wrists, to wander freely around a hospital where there were no bars on the windows.[13]

The defendants unpersuasively rely on *Nally v. Grace Community Church of the Valley*[14] to distinguish *Meier*. In *Nally*, a young man who received informal pastoral counseling committed suicide.[15] *Nally* simply declined to extend a duty of care "to personal or religious counseling relationships in which one person provided nonprofessional guidance to another seeking advice and the counselor had no control over the environment of the individual being counseled."[16]

In view of the numerous authorities holding that a jury may readily determine whether patients known to be a risk to themselves have been adequately supervised, we hold that D.P.'s claims do not raise "strict" medical malpractice issues requiring expert testimony.[17] Whether the hospital exercised reasonable care in supervising D.P. represents a factual question for the jury's resolution under an ordinary negligence framework. We therefore hold that it was error to require D.P. to present expert testimony regarding the hospital's alleged breach of its duty of care.

B. *It Was Error Not to Let D.P.'s Case Go to the Jury.*

D.P. contends that the superior court should have allowed the jury to consider the

---

was not "strictly speaking a malpractice case"); *Kent v. Whitaker*, 58 Wash.2d 569, 364 P.2d 556, 557 (1961) (action was "not a malpractice case" where patient with known suicidal tendencies strangled herself with plastic tubing while unattended in locked room because it did not concern "improper diagnosis or negligent treatment" but rather "failure of the specific duty of exercising reasonable care to safeguard and protect a patient with known suicidal tendencies from injuring herself"). *But see Reifschneider v. Nebraska Methodist Hosp.*, 222 Neb. 782, 387 N.W.2d 486, 488–89 (1986) (where emergency room patient fell from hospital cart, court refused to find that laypersons could determine whether hospital had duty to restrain or supervise patients on carts).

9. *See* AS 09.55.530–.560.

10. The court, however, did rely on AS 09.55.540 in requiring D.P. to present expert testimony.

11. 620 P.2d 194 (Alaska 1980).

12. 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968).

13. *Doyle,* 620 P.2d at 200.

14. 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948 (1988).

15. *Id.* 253 Cal.Rptr. 97, 763 P.2d at 950–52.

16. *Id.* 253 Cal.Rptr. 97, 763 P.2d at 957.

17. D.P.'s arguments for the hospital's breach of its duty involve issues of ordinary custodial care of patients, not specialized care that requires the use of medical judgment: Did the hospital monitor the front door properly? Did the staff take reasonable precautions to prevent D.P. from leaving? We note, however, that in so far as D.P. intends to argue issues that involve specialized medical decisions—such as the appropriate level of physical restraints or medication—she can do so only through expert testimony.

testimony of Dr. Schoettle and lay witnesses, in determining the issue of breach.

The defendants respond that no reasonable juror could have found that the defendants were negligent. They emphasize that the hospital is not a psychiatric hospital and lacks "any locked or secure patient facilit[ies], rooms or wards." The defendants also stress that the standard of care did not require "constant observation." They argue that D.P. conceded both that the nurses had flexibility in implementing the physician's orders[18] and that all except Hansen used reasonable care in observing D.P. They further note that Hansen discovered D.P.'s absence within five minutes.

The issues raised by the defendants concerning their use of reasonable care in supervising D.P. warrant resolution by a jury. D.P.'s pleadings and proposed jury instructions raise ordinary negligence issues. Drawing all inferences in favor of D.P. as the non-moving party, reasonable minds might differ as to whether the hospital's efforts to supervise D.P. were adequate in view of her known delusional condition. We conclude that the case should properly go to the jury under a theory of ordinary negligence.

C. *The Defendants' Interrogatory Answer Is Admissible to Show the Existence of a Duty of Care.*

■ D.P. argues that the superior court erred by refusing to characterize the defendants' interrogatory answer as an admission of both the existence of a duty and the breach of that duty. Specifically, D.P. asserts that the court erred by labeling this evidence as "discovery" rather than "proof," arguing that it should have been "weighed in the analysis of defendants' motion for a directed verdict."

Civil Rule 33(c) provides that answers to interrogatories "may be used to the extent permitted by the rules of evidence." The

defendants' answer in the present case bears directly upon the hospital's duty of care and should have been admitted for that purpose. We therefore hold that the interrogatory answer is admissible on the issue of the defendants' duty of care.[19]

## V. *CONCLUSION*

We REVERSE the directed verdicts in favor of the defendants and REMAND this case for a new trial utilizing an ordinary negligence framework.

CARPENETI, Justice, dissenting.

## I. *INTRODUCTION*

This medical malpractice case raises the question whether a hospital staff exercised care consistent with professional medical standards of restraint and supervision for a psychiatric patient. In such cases, Alaska law requires expert testimony to establish a breach of the standard of care before the plaintiff can recover. Because plaintiff offered no such testimony, even when notified by the trial court that it was required, I would affirm the trial court's decision to dismiss the case.

## II. *DISCUSSION*

The burdens of proof in a medical malpractice action in Alaska are set out in AS 09.55.540:

(a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

---

18. D.P. admitted that the nurses have "all the discretion in the world" as to how closely to observe D.P. and what precautions to take, but argued that "[t]he one issue they don't have discretion about is keeping her in the hospital or out of the hospital."

19. *See* Alaska R. Evid. 402 ("All relevant evidence is admissible" unless otherwise provided); Alaska R. Evid. 401 ("Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(b) In malpractice actions there is no presumption of negligence on the part of the defendant.

Therefore, it was D.P.'s burden to provide evidence establishing the applicable medical standard of care, the defendants' breach of that standard of care, and that the breach caused her injuries.[1] Moreover, as D.P. concedes, this court has previously followed the well-established rule that "[i]n medical malpractice actions the jury ordinarily may find a breach of professional duty only on the basis of expert testimony." [2]

### A. D.P.'s Case Was a Medical Malpractice Action as That Term Is Used in AS 09.55.540 and .550.

The court concludes that D.P.'s claims do not raise " 'strict' medical malpractice" issues [3] and that "[i]t remains far from clear ... that D.P.'s case should be viewed as a 'medical malpractice' action." [4] I disagree. Both the broad statutory use of the term "medical malpractice" and the commonly recognized legal definition of "malpractice" favor an application that covers lawsuits like D.P.'s.

The definitions section of the statutory chapter governing medical malpractice claims contains individual definitions indicative of the breadth of services and types of health service providers that the legislature intended that chapter to cover. For instance, AS 09.55.560(4) defines "professional negligence" as "a negligent act or omission by a health care provider in rendering professional services." And AS 09.55.560(5) defines "professional services" to include a "service provided by a health care provider that is within the scope of services for which the health care provider is licensed." Finally, AS 09.55.560(1) defines "health care provider" to include: "a nurse ...; a physician ...; a hospital ...; [and] an employee of a health care provider acting within the course and scope of employment." Taken together, the only conclusion to be drawn from these definitions is that sections 09.55.540 and .550 must apply to a broad range of actions taken in the provision of medical services. These services comfortably include the supervision of psychiatric patients in a hospital.

Similarly, the common definition of "malpractice" is:

Professional misconduct or unreasonable lack of skill. This term is usually applied to such conduct by doctors, lawyers, and accountants. Failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss or damage to the recipient of those services or to those entitled to rely upon them.[5]

Given the broad definition commonly applied to "malpractice" and the similarly broad statutory definitions in our statutes on "medical malpractice," I cannot agree that D.P.'s claim is one of "ordinary negligence" and not one of "medical malpractice." Accordingly, to the degree that the court suggests that D.P.'s claim that she was entitled to "reasonable and attentive care, including, ... adherence to physician's orders" was not a claim of medical malpractice, I cannot agree.

### B. The Notion of "Ordinary Negligence" Is Not Applicable Within the Context of a Professional Negligence Action.

I also disagree with the court's conclusion that it is appropriate to allow a jury to

---

1. *See* AS 09.55.540.

2. *Kendall v. State, Div. of Corrections*, 692 P.2d 953, 955 (Alaska 1984) (ellipsis omitted) (quoting *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 200 (Alaska 1980)).

3. Op. at 229.

4. Op. at 228.

5. Black's Law Dictionary 959 (6th ed.1990) (defining "malpractice").

resolve D.P.'s claim "under an ordinary negligence framework."[6] Implicit in this conclusion is the view that the individual acts that in the aggregate comprise any given medical service may be finely parsed into those acts judged under the rubric of ordinary negligence and those acts judged under the rubric of professional negligence. California, with its similar statutory scheme for medical malpractice, has rejected this approach.[7]

Moreover, the logic underlying the parsing approach to acts by health care providers is flawed because "ordinary negligence" is not applicable in a professional negligence case. The court relies on *Meier v. Ross General Hospital*,[8] a California case, for the proposition that "ordinary negligence" can exist in a medical malpractice setting.[9] But as the California Supreme Court recently explained in *Flowers v. Torrance Memorial Hospital Medical Center*,[10]

> whether the cause of action is denominated "ordinary" or "professional" negligence or both, ultimately only a single standard can obtain under any given set of facts and any distinction is immaterial....
>
> ... [A] defendant has only *one* duty, measured by *one* standard of care, under any given circumstances.[11]

That court then went on to further explain that when courts allow seemingly obviously negligent acts to supplant the need for expert testimony to establish the appropriate standard of care, their "reasoning confuses the manner of proof by which negligence can or must be established and the character of the negligence itself."[12]

The logic of *Flowers* and the cases that follow it is persuasive. There cannot be two standards of care that apply to one person for the same act at the same time—one "professional" and one "ordinary."

The allegedly negligent act at issue in this case took place during the provision of professional medical services. In these circumstances, AS 09.55.540 requires proof of the applicable standard of care and proof of a breach of that standard of care. Because there was no expert testimony, the plaintiff's case was insufficient unless an exception to the rule could be found.

## C. Reliance on the Common Knowledge Exception Is Not Appropriate in This Case.

The court finds an exception—the "common knowledge exception"—to the rule that expert testimony is needed to establish the standard of care. But that exception is incompatible with our statutory framework. Moreover, even if the common knowledge exception does not conflict with AS 09.55.550, it is inappropriate to apply it on the facts of this case.

### 1. The common knowledge exception is not compatible with AS 09.55.550.

The common knowledge exception has been explained as applying "when a layperson is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised."[13] That is, the

---

6. Op. at 229.

7. *See Bellamy v. Superior Court*, 50 Cal.App.4th 797, 57 Cal.Rptr.2d 894, 900–01 (1996):

   Some ... tasks may require a high degree of skill and judgment, but others do not. Each, however, is an integral part of the professional service being rendered. Trying to categorize each individual act or omission, all of which may occur within a space of a few minutes, into "ordinary" or "professional" would add confusion in determining what legal procedures apply if the patient seeks damages for injuries suffered at some point during the course of the examination or therapy. We do not see any need for such confusion or any indication the Legislature intended MICRA's

applicability to depend on such fine distinctions. (Footnote omitted.)

8. 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968).

9. Op. at 228–229.

10. 8 Cal.4th 992, 35 Cal.Rptr.2d 685, 884 P.2d 142 (1994) (in banc).

11. *See id.* 35 Cal.Rptr.2d 685, 884 P.2d at 146 (footnote omitted).

12. *Id.* 35 Cal.Rptr.2d 685, 884 P.2d at 147.

13. *Id.* (footnote and internal quotation marks omitted) (quoting *Engelking v. Carlson*, 13 Cal.2d 216, 88 P.2d 695 (1939)).

type of injury incurred could not have happened in the absence of negligence. But AS 09.55.550 provides, in part, that "[t]he jury shall be . . . instructed that injury alone does not raise a presumption of the health care provider's negligence or misconduct."

The common knowledge exception therefore allows the inference of negligence to be drawn from the proved existence of injury under a broad set of possible circumstances within the knowledge and observation of the general populace. This is, however, essentially a working definition of "presumption." [14] Since AS 09.55.550 explicitly requires the court to instruct the jury that "injury alone does not raise a presumption of . . . negligence," application of the common knowledge exception is inconsistent with Alaska law.

2. *Even if generally applicable, the common knowledge exception should not be applied on the facts of this case.*

There are two theories under which the hospital could have become liable to D.P. First, either Dr. McCandless or Dr. Schoettle, or both, could have been professionally negligent in prescribing D.P.'s course of treatment and care. But D.P. did not allege any failing by either of her doctors. Accordingly, the hospital and nursing staff are not liable to D.P. for shortcomings attributable to Dr. McCandless's treatment and supervision order,[15] unless there were changed circumstances that should have alerted the nursing staff to take appropriate action.[16]

D.P. therefore cannot rely on any claim that suggests alternative methods of physical, supervisory, or narcotic restraint should have been ordered or implemented because these decisions were within the doctors' exclusive province of professional responsibility.

Second, and relevant to the common knowledge exception, D.P.'s nurses may have been professionally negligent in implementing Dr. McCandless's flexible treatment order. But, as with a doctor's professional judgments, a failure in care arising out of a nurse's discretionary actions implicates professional negligence. As the court in *Sabol v. Richmond Heights General Hospital*[17] stated:

> The law of medical negligence imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances. *Likewise, nurses are persons of knowledge and skill and must employ that degree of care and skill that a nurse of ordinary care, skill and diligence would employ in similar circumstances.*[18]

Thus, to support this theory D.P. had to provide expert testimony establishing the appropriate standard of care of a professional nurse operating under similar circumstances,[19] unless the proper level of supervision and restraint of a psychiatric patient was peculiarly within the common knowledge of the average citizen. That it was not in

**14.** *See* Blacks Law Dictionary 1203 (7th ed.1999) (defining "presumption" as "[a] legal inference or assumption that a fact exists, based on the known or proven existence of some other fact or group of facts"); *see also* Commentary to Alaska Rule of Evidence 301(a), second paragraph (defining "presumption").

**15.** *See Dimitrijevic v. Chicago Wesley Mem'l Hosp.*, 92 Ill.App.2d 251, 236 N.E.2d 309, 314 (1968) (holding that hospital was under no duty to take precautions not ordered by the attending physician); *State v. Washington Sanitarium and Hosp.*, 223 Md. 554, 165 A.2d 764, 766 (1960) (stating that "[i]t was not incumbent upon the nurses and attendants to apply restraints or supervision which the attending physician" did not order); *Sabol v. Richmond Heights Gen. Hosp.*, 111 Ohio App.3d 598, 676 N.E.2d 958, 960 (1996) (holding that the hospital was not liable

where its staff provided the protective measures ordered by the attending physician to prevent suicide).

**16.** *See Washington Sanitarium,* 165 A.2d at 766.

**17.** 111 Ohio App.3d 598, 676 N.E.2d 958.

**18.** *Id.* at 960 (emphasis added) (citations omitted).

**19.** *See Hitch v. Ohio Dep't of Mental Health,* 114 Ohio App.3d 229, 683 N.E.2d 38, 45 (1996); *Payne v. Milwaukee Sanitarium Found., Inc.,* 81 Wis.2d 264, 260 N.W.2d 386, 390–91 (1977) ("Where the patient requires professional nursing or professional hospital care, then expert testimony as to the standard of that type of care is necessary.") (citation omitted).

this case is evident by reviewing *Flowers*, which makes clear the strictly limited range of the common knowledge exception:

> In this regard, this court has on numerous occasions articulated the general rule applicable in negligence cases arising out of the rendering of professional services: "The standard of care ... is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of the layman." The "common knowledge" exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson "is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised." *The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery.*[20]

This is clearly not such a case. The measures which a nurse might appropriately take to monitor a paranoid schizophrenic patient, and to dissuade such a patient from leaving should that be her obvious intent, and to attempt to restrain her in the event persuasion was unsuccessful, are not obvious to the lay person.[21]

Moreover, Alaska has legislatively nullified the doctrine of *res ipsa loquitur* in medical malpractice cases.[22] Yet under D.P.'s theory of the case, the fact that she got outside the building indicates that there was a breach of the standard of care. This argument is virtually indistinguishable from *res ipsa loquitur*. Moreover, "proof of a bad result or mishap is no evidence of lack of skill or negligence."[23] D.P.'s conclusion therefore

leaps two steps—the standard of care and breach—when only one is implicated by the fact of her leaving the building. The first step, and the step on which D.P.'s case falters, is the question of the standard of care. What was the applicable standard of care for the nursing staff to protect D.P. from herself? What was the staff required or permitted to do—and what was it precluded from doing—in fulfilling its duty to her?

Laypersons cannot accurately answer that question without expert assistance. Both Alaska law and the realities of decisionmaking lead to that conclusion. Whether Nurse Hansen's checking up on D.P. five minutes after seeing her in the hallway (and discovering she was gone) was commensurate with the professional standards of a nurse in Wrangell General Hospital supervising a psychiatric patient is surely an issue outside the common knowledge of laypersons.

D. *D.P.'s Claims Were Properly Dismissed Because She Failed to Produce Evidence to Support a Breach of the Duty of Care Established by Dr. Schoettle's Testimony.*

Finally, D.P.'s negligence claim fails on the alternative basis that even when the evidence is viewed in the manner most favorable to her, it does not support a claim that Nurse Hansen failed to properly supervise D.P. under the standard of care set out in Dr. Schoettle's testimony—the only evidence produced at trial on that subject.

Dr. Schoettle's uncontradicted testimony established that "the nursing notes do not suggest any negligence whatsoever on the part of the nursing staff." Since D.P. did not provide documentary evidence or her own witness (expert or not) to testify on this claim, Dr. Schoettle's testimony established the standard of care and that there was no

---

20. 35 Cal.Rptr.2d 685, 884 P.2d at 147 (emphasis added) (footnote and citations omitted).

21. *See Baker v. United States*, 226 F.Supp. 129, 132 (S.D.Iowa 1964) ("It is particularly recognized in the treatment of mental patients that diagnosis is not an exact science.... Further *the objective is treatment not merely incarceration.* Treatment requires the restoration of confidence in the patient. This in turn requires that restrictions be kept at a minimum. Risks must be

taken or the case left as hopeless.") (emphasis added) (citations omitted), *aff'd*, 343 F.2d 222 (8th Cir.1965).

22. *See Priest v. Lindig*, 583 P.2d 173, 175–76 & n. 7 (Alaska 1978) (citation omitted).

23. *Dimitrijevic v. Chicago Wesley Mem'l Hosp.*, 92 Ill.App.2d 251, 236 N.E.2d 309, 312 (1968).

breach of that standard by the nurses' actions. Accordingly, D.P. did not made out a *prima facie* case of professional negligence against the nursing staff.

III. *CONCLUSION*

Alaska law required D.P. to present expert testimony to establish that the hospital or its staff violated standards of professional care while she was under their control. Because she did not do so, I would affirm the trial court. I would not allow this medical malpractice case to proceed under an "ordinary negligence" framework. I therefore dissent.