JOURNAL ENTRY AND OPINION
{¶ 1} Donald S. Berlin, Executor of the Estate of Morris Berlin, appeals from the judgment of the trial court that directed a verdict in favor of defendants Heather Hill Hospital Health and Care Center ("Heather Hill"). For the reasons set forth below, we reverse and remand for further proceedings consistent with this opinion.
 {¶ 2} On August 20, 2002, plaintiff filed this medical malpractice/wrongful death action against Heather Hill, Dr. Lynn Myers, and the Cleveland Clinic Foundation. The matter was subsequently dismissed as to the Cleveland Clinic Foundation, and a personal injury survivorship claim brought on behalf of the decedent was dismissed as untimely.
 {¶ 3} The matter proceeded to a jury trial on July 20, 2004. Plaintiff maintained, essentially, that the decedent came to Heather Hill for rehabilitative therapy after he broke his pelvis and wrist in a fall. At this time, his Coumadin levels were not properly monitored, resulting in his deterioration and death. Defendants maintained, however, that the decedent had an array of health problems, and his blood had thinned because he had sepsis, was malnourished, and was on antibiotics. They noted that he died from cardiopulmonary arrest secondary to pneumonia.
 {¶ 4} Plaintiff presented the testimony of Heather Hill physician's assistant Barbara Anderson and Dr. Stephen Baum.
 {¶ 5} Barbara Anderson testified upon cross-examination that the decedent was admitted to Heather Hill following his discharge from Hillcrest Hospital. At this time, his medications included Paxil, Albuterol for chronic obstructive lung disease, Resperal for confusion, and Coumadin, a blood thinner.
 {¶ 6} The Coumadin order was 2 milligrams on Sundays, Mondays, Wednesdays and Thursdays, and 1 milligram on Fridays and Saturdays. The order also instructed that his blood was to be tested on a daily basis until the decedent became stable and the results were to be reported within 24 hours. Under Heather Hill's procedures, blood was drawn at Heather Hill, picked up by someone from the Cleveland Clinic, where it was analyzed, and the results were then reported to Heather Hill.
 {¶ 7} The testing order was written on November 30, 2000, and testing was to begin on the next day, December 1, 2000. The decedent's blood was tested on this date, and the results, reported to Heather Hill the following day, were PT of 16.9 and INR of 1.48, or within therapeutic levels. There is no evidence that the decedent's levels were tested on December 2, 2000. His blood was drawn on December 3, 2000, and the results, reported to Heather Hill that same date, list a PT of 31.1 and INR of 2.73. On December 4, 2000, the decedent's blood was drawn and the results, reported to Heather Hill on December 6, 2000, show a PT of 44.3 and INR of 3.89, or higher than therapeutic levels. There was no evidence that Anderson or Dr. Myers discussed this result and the decedent continued to receive his prescribed dosage of Coumadin. The decedent's blood was not tested on December 5, 2000.
 {¶ 8} Upon questioning from Heather Hill, Anderson noted that the decedent's PT levels had reached 26.6 and the INR level had reached 4.8 while the decedent was admitted at Hillcrest Hospital. He was also on a higher dosage of Coumadin at that time, but Hillcrest later changed the dosage.
 {¶ 9} Anderson further stated that daily monitoring was no longer required after December 4, 2000, and that the decedent was showing no signs of bleeding as of that date. According to Anderson, the decedent's lung condition began to deteriorate, and she then became concerned that he was becoming septic from pneumonia.
 {¶ 10} Dr. Baum testified as an expert for plaintiff. He stated that Coumadin, or Warfarin, inhibits blot clots. Once this drug is prescribed, PT and INR levels should be monitored to avoid side-effects.
 {¶ 11} In this matter, the drug prescribed for the decedent because he had a pulmonary embolism and a history of atrial fibrillation. According to Dr. Baum, he was at particularly high risk of side-effects from excess Coumadin. Dr. Baum further opined that the facility must make sure that the tests that are ordered are performed and that test results are obtained and reported to the ordering physician. The physician must make sure that he or she has received results of tests that are ordered.
 {¶ 12} Dr. Baum testified that Dr. Myers' and Barbara Anderson's monitoring or the Coumadin therapy was below the standard of care. Dr. Myers acted below the standard of care with regard to not obtaining test results, and in continuing the Coumadin regimen in light of the test results that were available. Test results indicating an INR of 3.89 indicated that the threshold for excessive anticoagulation had been exceeded and was part of a trend of increasing INR results. At this time, the dosage of the drug should have been changed. The facility acted below the standard of care insofar as it did not perform tests that were ordered, and insofar as it did not transmit test results to Dr. Myer and Anderson.
 {¶ 13} According to Dr. Baum, the decedent was over-anticoagulated when he came to the emergency room on December 8, 2000. He was bleeding at multiple sites, had blood in his urine, was coughing up blood and had multiple ecchymosis and hematomes of the skin.
 {¶ 14} Finally, Dr. Baum opined, to a reasonable degree of medical probability, that the failures in meeting the standard of care as to the Coumadin dosage contributed to the decedent's death in the following manner:
 {¶ 15} "I believe the high INR created a situation where the patient's body started to fail which resulted in his hospitalization, and because of his multiple other medical problems began the process where his body started to shut down and eventually resulted in his death.
 {¶ 16} "* * *
 {¶ 17} "The Coumadin was administered in such a way that his blood became too thin. Consequently, he started to bleed from various sources. The net result was that he became anemic. In addition, he had some bleeding in his lungs. One of his underlying medical problems was chronic obstructive lung disease, and he had pneumonia on top of that which creates irritation within the lung.
 {¶ 18} "I believe that between the bleeding in his lung, which exacerbated his pneumonia, and in addition to having very little oxygen carrying capacity because of the anemia, his body started to fail."
(Tr. 130-131).
 {¶ 19} On cross-examination, Dr. Baum acknowledged that the decedent had several other illnesses that could have resulted in his death. He also stated that the bleeding was a cause but not the cause of death, in light of the decedent's other health problems. Dr. Baum stated that the decedent had "a lot of other factors that potentiate the effect of Coumadin, but in and of itself, * * * they would not make his prothrombin time be that high." (Tr. 142).
 {¶ 20} When asked whether the sepsis caused the bleeding, Dr. Baum opined to a reasonable degree of medical certainty that the Coumadin caused the bleeding because the INR level was elevating before the decedent went to the hospital. (Tr. 157).
 {¶ 21} Finally, Dr. Baum testified on cross-examination as follows:
 {¶ 22} "Q. * * * [E]ven if Dr. Myers had monitored the Coumadin like you are saying he should have done, it's your opinion that Mr. Berlin's death would not have been avoided?
 {¶ 23} "A. At some time down the road, yeah. In a day? In a month? In a year?
 {¶ 24} "Q. * * * It's your opinion that even if Dr. Myers had done everything you claimed he should have done, Mr. Berlin's death would not have been avoided on December the 26th, 2000, that's your opinion; isn't that true?
 {¶ 25} "A. Well, I disagree."
(Tr. 165-166).
 {¶ 26} The trial court subsequently determined that reasonable minds could only conclude that plaintiff failed to present sufficient evidence that defendants proximately caused the decedent's death, and it directed a verdict for defendants.
 {¶ 27} Plaintiff appeals, and Dr. Myers and Heather Hill cross-appeal.
 A. PLAINTIFF'S APPEAL {¶ 28} Plaintiff's assignment of error states:
 {¶ 29} "The trial court erred in directing a verdict for defendant appellees."
 {¶ 30} The standard for granting a directed verdict is found in Civ.R. 50(A)(4):
 {¶ 31} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion * * *."
 {¶ 32} In Strother v. Hutchinson (1981), 67 Ohio St.2d 282,284, 423 N.E.2d 467, 469, the court explained:
 {¶ 33} "The law in Ohio regarding directed verdicts is well formulated. * * * Thus, `if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. Kellerman v. J.S. DurigCo. (1964), 176 Ohio St. 320 [27 O.O.2d 241, 199 N.E.2d 562] * * *.' Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 115
[4 O.O.3d 243, 244, 363 N.E.2d 367, 368]."
 {¶ 34} The general rule of causation in medical malpractice cases requires the plaintiff to present some competent, credible evidence that the defendant's breach of the applicable standard of care "probably" caused plaintiff's injury or death. Hitch v.Ohio Dept. of Mental Health (1996), 114 Ohio App. 3d 229, 240,683 N.E.2d 38.
 {¶ 35} In this matter, plaintiff presented the testimony of Dr. Baum who testified that Dr. Myers' and Barbara Anderson's monitoring or the Coumadin therapy was below the standard of care, that the facility acted below the standard of care insofar as it failed to perform tests that were ordered and insofar as it failed to transmit test results to Dr. Myers or Anderson. According to Dr. Baum, Dr. Myers acted below the standard of care with regard to not obtaining test results, and in continuing the Coumadin regimen in light of the test results that indicated that the threshold for excessive anticoagulation had been exceeded and that the decedent had increasing INR results. Dr. Baum also testified that the decedent was over-anticoagulated when he came to the emergency room. He was bleeding at multiple sites, had blood in his urine, was coughing up blood and had multiple ecchymosis and hematomes of the skin.
 {¶ 36} Dr. Baum opined that the failures in meeting the standard of care as to the Coumadin dosage contributed to the decedent's death in the following manner:
 {¶ 37} "I believe the high INR created a situation where the patient's body started to fail which resulted in his hospitalization, and because of his multiple other medical problems began the process where his body started to shut down and eventually resulted in his death.
 {¶ 38} "* * *
 {¶ 39} "The Coumadin was administered in such a way that his blood became too thin. Consequently, he started to bleed from various sources. The net result was that he became anemic. In addition, he had some bleeding in his lungs. One of his underlying medical problems was chronic obstructive lung disease, and he had pneumonia on top of that, which creates irritation within the lung.
 {¶ 40} "I believe that between the bleeding in his lung, which exacerbated his pneumonia, and in addition to having very little oxygen carrying capacity because of the anemia, his body started to fail."
(Tr. 130-131).
 {¶ 41} On cross-examination, Dr. Baum acknowledged that the decedent had several other illnesses that could have resulted in his death. He also stated that the bleeding was a cause but not the cause of death, in light of the decedent's other health problems and he disagreed with defense counsel's claim that death would have occurred anyway at that time due to the decedent's other health problems.
 {¶ 42} We find that the foregoing constitutes substantial, competent evidence upon which reasonable minds might reach different conclusions as to plaintiff's claim of malpractice. Further, although Dr. Baum stated on cross-examination that the bleeding was a cause but not the cause of death, in light of the decedent's other health problems, this did not negate Dr. Baum's earlier testimony on redirect. Cf. Heath v. Teich, Franklin App. No. 03AP-1100, 2004-Ohio-3389.
 {¶ 43} Moreover, in Roberts v. Ohio Permanente Med. Group,Inc., 76 Ohio St.3d 483, 488, 1996-Ohio-375, 668 N.E.2d 480, the Supreme Court held that a plaintiff, who was already suffering from some disease or disorder at the time the malpractice occurred, can recover for his "lost chance" even though the overall possibility of survival or recovery was less than probable. See, also, McMullen v. Ohio State UniversityHospitals (2000), 88 Ohio St.3d 332, 338-339, 725 N.E.2d 1117.
 {¶ 44} In accordance with the foregoing, the trial court erred in directing a verdict for defendants. The plaintiff's assignment of error is well-taken.
 B. DR. MYER'S APPEAL {¶ 45} Dr. Myer assigns two errors for our review. The first assignment of error states:
 {¶ 46} "The trial court erred in denying defendant's, Dr. Lynn Myers' motion for summary judgment based on the uncontroverted fact that the plaintiff failed to establish a prima facie case of medical malpractice as a matter of law."
 {¶ 47} Within the motion for summary judgment, Dr. Myers asserted that plaintiff failed to establish the requisite element of proximate cause since Dr. Baum could not establish that the decedent's death would have been avoided if the Coumadin levels were managed differently. Because this argument does not accurately reflect the law, this assignment of error is without merit. Roberts v. Ohio Permanente Medical Group, Inc., supra;McMullen v. Ohio State University Hospitals.
 {¶ 48} Dr. Myers also cites to Dr. Baum's trial testimony and complains that the plaintiff's counsel questioned Dr. Baum as to whether the manner in which the Coumadin was handled "contributed" to the decedent's death. We note that Dr. Baum responded:
 {¶ 49} "I believe the high INR created a situation where the patient's body started to fail which resulted in his hospitalization, and because of his multiple other medical problems began the process where his body started to shut down and eventually resulted in his death.
 {¶ 50} "* * *
 {¶ 51} "The Coumadin was administered in such a way that his blood became too thin. Consequently, he started to bleed from various sources. The net result was that he became anemic. In addition, he had some bleeding in his lungs. One of his underlying medical problems was chronic obstructive lung disease, and he had pneumonia on top of that which creates irritation within the lung.
 {¶ 52} "I believe that between the bleeding in his lung, which exacerbated his pneumonia, and in addition to having very little oxygen carrying capacity because of the anemia, his body started to fail."
(Tr. 130-131).
 {¶ 53} This testimony, offered to a reasonable degree of medical probability, was sufficient as to the issue of proximate cause.
 {¶ 54} This assignment of error is without merit.
 {¶ 55} Dr. Myers' second assignment of error states:
 {¶ 56} "The trial court erred in denying defendant's, motions for directed verdict at the close of plaintiff's opening statement due to plaintiff's counsel's failure to allege facts to be proven which would establish a prima facie case of medical malpractice."
 {¶ 57} "A trial court should exercise great caution in sustaining a motion for a directed verdict on the opening statement of counsel; it must be clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action or a defense, and the statement must be liberally construed in favor of the party against whom the motion has been made." Brinkmoeller v. Wilson (1975),41 Ohio St.2d 223, 325 N.E.2d 233, syllabus. To sustain a directed verdict motion made upon opening statement, "it must be clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action or a defense, and the statement must be liberally construed in favor of the party against whom the motion has been made." Id.
 {¶ 58} In this instance, plaintiff's opening statement indicated that the decedent came to Heather Hill for rehabilitative therapy after he broke his pelvis and wrist in a fall, that his Coumadin levels were not properly monitored and escalated, resulting in his deterioration and death. The opening statement was sufficient to set forth the cause of action and the trial court did not err in denying the motion for a directed verdict on the basis of plaintiff's opening statement.
 {¶ 59} The second assignment of error is without merit.
 C. HEATHER HILL'S APPEAL {¶ 60} Heather Hill's first assignment of error states:
 {¶ 61} "The trial court erred when it failed to direct a verdict in favor of defendant-appellee Heather Hill Hospital 
Care Center at the close of opening statements."
 {¶ 62} As was discussed previously, the plaintiff's opening statement was sufficient to set forth the cause of action and the trial court did not err in denying the motion for a directed verdict on the basis of plaintiff's opening statement.
 {¶ 63} This assignment of error is without merit.
 {¶ 64} Heather Hill's second assignment of error states:
 {¶ 65} "The trial court abused its discretion when it denied defendant-appellee Heather Hill Hospital Care Center's motion in limine to exclude opinions by appellant's expert that were not expressed in deposition to the requisite degree of medical probability."
 {¶ 66} "An appellate court does not directly review the rulings on motions in limine. A pretrial ruling on such a motion is a preliminary precautionary ruling by a court in anticipation of its ruling on evidentiary issues at trial. * * * A court's initial denial of a motion in limine does not preserve any error for review. * * * Thus, the evidence must be presented at trial, and a proper proffer made, in order to preserve the error for appeal." White v. Center Mfg. Co. (1998), 126 Ohio App.3d 715,722, 711 N.E.2d 281. See, also, Steubenville v. Schmidt,
Jefferson App. No. 01 JE 13, 2002-Ohio-6894.
 {¶ 67} Moreover, the decision to admit or exclude evidence is within the broad discretion of the trial court and, absent an abuse of discretion that is materially prejudicial to a party, a trial court's decision will stand. Krischbaum v. Dillon (1991),58 Ohio St.3d 58, 66, 567 N.E.2d 1291. An abuse of discretion, however, connotes more than an error of law or judgment; rather, it implies the court's attitude was unreasonable, arbitrary, or unconscionable. Tracy v. Merrell Dow Pharmaceuticals, Inc.
(1991), 58 Ohio St.3d 147, 152, 569 N.E.2d 875.
 {¶ 68} We find no abuse of discretion. Dr. Baum opined, to a reasonable degree of medical probability, that the failures in meeting the standard of care as to the Coumadin dosage began the process where his body started to shut down and eventually resulted in his death.
 {¶ 69} This assignment of error is without merit.
The judgment of the trial court is reversed and the matter is remanded for further proceedings consistent with this opinion.
This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellees his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, J., concurs. Blackmon, A.J., Dissents. (See Attached Dissenting Opinion)
 DISSENTING OPINION